José Carlos Colón Ventura y otros, demandantes y recurridos, *v.* Hon. Justo A. Méndez y otros, demandados y recurrentes.

*Número:* RE-88-30 *Resuelto:* 5 de mayo de 1992

*Rafael Ortiz Carrión* y *Jorge E. Pérez Díaz, Procuradores Generales, Norma Cotti Cruz, Subprocuradora General Auxiliar, Sylvia Cancio Bigas* y *Laura Ydrach Vivoni, Procuradoras Generales Auxiliares*, abogados de la parte recurrente; *Arturo Arzón Rivera*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Departamento de Recursos Naturales recurre ante este Foro para que revoquemos una sentencia emitida por el Tribunal Superior, Sala de Humacao, que resolvió que la agencia carecía de jurisdicción para adjudicar una controversia surgida respecto a una propiedad a ser restaurada en la zona costanera de Culebra. Debido al valor ecológico de la Isla de Culebra y a la necesidad de que se delimitara la jurisdicción de las distintas agencias gubernamentales que protegen su ambiente, expedimos el auto de revisión. Concluimos que el Departamento de Recursos Naturales tiene a su cargo la vigilancia y protección de la zona marítimo-terrestre en todo Puerto Rico y revocamos.

I

El Sr. José Carlos Colón Ventura (de aquí en adelante Colón Ventura) posee una estructura en la Calle Escudero #150 del poblado de Dewey en Culebra, Puerto Rico. Como la casa está ubicada en "la zona costanera" y Colón Ventura interesaba "reparar las partes afectadas y podridas por la polilla", solicitó de la Autoridad de Conservación y Desarrollo de Culebra (de aquí en adelante la Autoridad)

un endoso para realizar dicha obra de restauración. Al poco tiempo la Autoridad concedió el endoso "única y exclusivamente para reparar las partes más deterioradas de la estructura" (*Exhibit IX*, pág. 81), con la condición siguiente:

En vista de que los terrenos utilizados por el solicitante, están ubicados en terrenos rescatados al mar o en zona marítima terrest[r]e, que son terrenos de dominio público, *bajo el control del Departamento de Recursos Naturales*, el peticionario deberá solicitar de dicho Departamento un endoso para realizar la actividad arriba descrita. (Énfasis suplido.) *Exhibit* IX, pág. 81.

El mismo día en que se le concedió este endoso, Colón Ventura procedió a presentar una petición en el Departamento de Recursos Naturales (de aquí en adelante Recursos Naturales). La agencia concedió permiso para realizar la obra sujeto a que no se hiciera una reconstrucción total de la estructura y que reparara mediante el uso de madera y zinc. De esta manera, expresamente, se excluyó el uso de hormigón, cemento o bloques.

Así las cosas, a través de la Autoridad, Recursos Naturales advino en conocimiento que el señor Colón Ventura había procedido a demoler la estructura. Por medio de un vigilante, la agencia obtuvo información de que había bloques y cemento en el solar y de que Colón Ventura se proponía construir con los referidos materiales.

A raíz de las violaciones a los endosos concedidos, Recursos Naturales ordenó al querellado que detuviera la obra de construcción y lo citó para una vista administrativa. En dicha vista tendría la oportunidad de ser oído, de contrainterrogar testigos y de estar asistido por un abogado.

Poco tiempo después, Colón Ventura presentó ante Recursos Naturales una moción de desestimación en la que impugnó su jurisdicción, alegando que esa agencia no estaba facultada para requerir un endoso con respecto a la obra que él se proponía realizar. Alegó que dicha facultad era exclusiva de la Autoridad de Preservación y Desarrollo

de Culebra, en virtud de la Ley Núm. 66 de 22 de junio de 1975 (21 L.P.R.A. sec. 890 *et seq.*).

Antes que la agencia resolviera su moción de desestimación, Colón Ventura presentó una demanda contra Recursos Naturales en virtud de la cual solicitaba que se expidiera un *injunction* para que la referida agencia se abstuviera de intervenir con las obras de construcción que él se disponía a realizar. El día de la vista señalada por el tribunal a quo, Recursos Naturales notificó a Colón Ventura la contestación a la demanda. En la misma, la agencia adujo por vía de defensa afirmativa y mediante reconvención, que la estructura en controversia estaba ubicada en una zona marítimo-terrestre y que, por consiguiente, era de dominio público. Invocó la definición de lo que constituye una zona marítimo-terrestre contenida en la Ley de Muelles y Puertos de Puerto Rico de 1886.

El 20 de noviembre de 1987 el Tribunal Superior (Hon. María Gómez, Juez) dictó sentencia y declaró con lugar la demanda de *injunction*. Ordenó al Departamento de Recursos Naturales que de forma inmediata cesara de intervenir con las obras de reparación de Colón Ventura. Concluyó que Recursos Naturales carecía de jurisdicción sobre la zona marítimo-terrestre de Culebra. El tribunal entendió, además, que tanto la Autoridad como Recursos Naturales tenían que aceptar la zonificación establecida por la Junta de Planificación respecto a ese solar y que tan solo a la Administración de Reglamentos y Permisos le correspondía limitar el tipo de materiales a utilizarse. Finalmente, resolvió que debido a la insuficiencia de la prueba presentada no podía concluir que el terreno donde se encuentra ubicada la estructura pertenece a la zona marítimo-terrestre y que, por consiguiente, tampoco podía resolver que era de dominio público.

De dicha sentencia recurre ante nos Recursos

Naturales.([1]) En resumen, alega que el Tribunal Superior se equivocó al declararlo sin jurisdicción sobre la controversia, al resolver que dicha agencia carecía de facultad para reglamentar el uso de materiales y al concluir que el terreno objeto de este pleito no estaba en la zona marítimo-terrestre. Identifican además como errores, el hecho de que el tribunal asumió jurisdicción en un pleito en el que no se habían agotado los remedios administrativos y al expedir un *injunction* para impedir la actuación de un funcionario público al amparo de una ley. Revocamos y devolvemos el caso a Recursos Naturales para la continuación de los procedimientos.

## II

Argumenta el Procurador General en su escrito, que el Tribunal Superior estaba impedido de atender la controversia de autos porque el procedimiento iniciado a través del cauce administrativo no había culminado, es decir, que

---

([1]) Textualmente aducen que:

"1. Erró el Honorable Tribunal de instancia al determinar que el Departamento de Recursos Naturales no tiene jurisdicción sobre la zona marítimo-terrestre de Culebra, ya sea propi[a] o delegad[a] por la Autoridad de Conservación y Desarrollo de Culebra y concluir que la jurisdicción de dicha zona corresponde sólo a la Autoridad de Conservación y Desarrollo de Culebra.

"2. Erró el Honorable Tribunal al disponer que el Departamento de Recursos Naturales no podía reglamentar el uso de materiales en las construcciones o reparaciones que se hagan a estructuras ubicadas en la zona marítimo-terrestre.

"3. Erró el Honorable Tribunal de instancia al concluir, contrario a la prueba presentada por las partes e incluso a otra de sus conclusiones, que el terreno donde ubica la estructura del demandante recurrido no estaba en la zona marítimo-terrestre de Culebra.

"4. Erró el Honorable Tribunal de instancia al asumir jurisdicción sobre el caso de autos no obstante el hecho de que se había iniciado en el Departamento de Recursos Naturales un procedimiento administrativo en torno a la controversia entre las partes, razón por la cual el demandante tenía que agotar los remedios administrativos antes de acudir al foro judicial.

"5. Erró el Honorable Tribunal de instancia al expedir un injunction para impedir la actuación de un funcionario público al amparo de una ley, en este caso el ejercicio de la facultad del Secretario de Recursos Naturales derivada de la Ley Orgánica del Departamento de Recursos Naturales, todo ello en violación de la Ley Núm. 1 del 25 de febrero de 1946, 32 L.P.R.A. [s]ec. 3524(3)."

Colón Ventura no había agotado los remedios administrativos. Tiene razón. Veamos por qué.

■ Dos (2) son los principios que gobiernan el momento en que está disponible para una parte un remedio judicial, cuando también está a su alcance el cauce administrativo. Estas son la doctrina de jurisdicción primaria y la de agotamiento de remedios administrativos.[2]

■ La doctrina de jurisdicción primaria, a su vez, tiene dos (2) vertientes, a saber: la jurisdicción primaria, exclusiva y la jurisdicción primaria concurrente. En la primera, la ley dispone que el organismo será el único que tendrá jurisdicción inicial para examinar la reclamación. *Aguilú v. P.R. Parking System*, 122 D.P.R. 246 (1988). A las cortes se les despoja de cualquier jurisdicción original que de otra forma poseerían y su función en los casos concernidos se limita a la revisión judicial. B. Schwartz, *Administrative Law*, 2da ed., 1984, Sec. 8.24, pág. 488.

■ La jurisdicción concurrente ocurre cuando la ley permite que la reclamación se inicie bien en el foro administrativo o en el judicial. Es decir, cuando una reclamación puede ventilarse en el foro judicial pero bajo un esquema regulatorio se ha referido a un cuerpo administrativo especializado, el proceso judicial queda suspendido por deferencia a la agencia. 4 *Davis, Administrative Law Treatise* Sec. 22.1, pág. 83 (2da ed. 1983).

■ A diferencia de la jurisdicción primaria, la doc-

---

[2] Estas doctrinas son claramente distinguibles:
"La doctrina de jurisdicción primaria no debe confundirse con la que requiere que se agoten los procedimientos administrativos antes de acudirse a los tribunales, aunque ambas son germanas y persiguen el mismo fin: poner orden en la administración de la justicia y armonizar el funcionamiento de la rama judicial con el de su rama hermana, la ejecutiva. La doctrina que requiere que se agoten los procedimientos administrativos determina la etapa en la cual el litigante puede recurrir a los tribunales; la de la jurisdicción primaria determina qué organismo debe hacer la determinación inicial del asunto." (Escolio omitido.) *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 513 (1964).

trina de agotamiento de remedios administrativos opera en una etapa posterior del procedimiento ante la agencia. El principio de agotamiento requiere que el que desee obtener un remedio en una agencia utilice todas las vías administrativas disponibles antes de recurrir al tribunal. Bajo esta doctrina la revisión judicial de la decisión administrativa no está disponible hasta que la parte afectada utilice todos los procedimientos correctivos ofrecidos por el proceso administrativo. *Myers v. Bethlehem Corp.*, 303 U.S. 41, 50–51 (1938); *Davis, Administrative Law Treatise*, supra, Sec. 26:1; Schwartz, *op. cit.*, pág. 503. El propósito de esta norma es establecer el momento idóneo en el cual el proceso judicial debe intervenir en una controversia sometida previamente a la esfera administrativa. *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991), y casos allí citados. Razones de sana administración gubernamental nutren este principio:

> Al invocar la doctrina y posponer la etapa en la cual el litigante puede recurrir a los tribunales, se logran varios objetivos. En primer lugar, antes de la intervención judicial la agencia puede desarrollar un historial completo del asunto ante su consideración. También puede utilizar el conocimiento especializado de sus funcionarios para adoptar las medidas correspondientes de conformidad con la política pública formulada por la entidad y aplicar uniformemente sus poderes para poner en vigor las leyes, rectificar oportunamente sus errores o reconsiderar el alcance de sus pronunciamientos. De esta manera se evitan los disloques causados por las intervenciones inoportunas de los tribunales en distintas etapas interlocutorias y el poder judicial conserva autoridad para intervenir en los momentos en que sea necesario para evitar un daño irreparable a una persona. *Rivera v. E.L.A.*, 121 D.P.R. 582, 595 (1988).

Además, recientemente el Tribunal Supremo de Estados Unidos, al reafirmar la sabiduría de la doctrina de agotamiento de remedios administrativos, expresó que la misma es requerida porque cumple un propósito dual de proteger

la autoridad agencial y de promover la eficiencia judicial. *McCarthy v. Madigan*, 60 U.S.L.W. 4191 (1992).

■ Sin embargo, la doctrina de agotamiento de remedios administrativos, no es de aplicación inflexible. Existen circunstancias que justifican que un litigante pueda preterir el canal administrativo. Así, por ejemplo, hemos establecido que no es necesario concluir los trámites administrativos provistos cuando lo presentado es una cuestión de derecho que no requiere el ejercicio de discreción administrativa, hay una violación a los derechos civiles, el remedio administrativo es inútil e inadecuado, existe peligro de daño inminente o hay una clara ausencia de jurisdicción. Véanse, entre otros: *Rivera v. E.L.A.*, supra; *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347, 356 esc. 4 (1988).

■ Merece particular atención la excepción que se activa frente a un planteamiento de que la agencia ante la cual se está litigando carece de jurisdicción. De entrada, procede que aclaremos que no toda alegación de ausencia de jurisdicción va a tener el efecto de liberar a la parte de culminar sus gestiones en la agencia. Cualquier otra interpretación tendría el efecto de eliminar de facto la doctrina de agotamiento de remedios. Ante una alegación de ausencia de jurisdicción, es a la propia agencia, salvo unas excepciones, a la que le corresponde hacer una determinación inicial de su propia jurisdicción.

■ En *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 723 (1982), adoptamos tres (3) criterios a utilizarse ante un señalamiento de ausencia de jurisdicción de la agencia. Allí dijimos que debía considerarse, en primer lugar, el riesgo de que se ocasione un daño irreparable si el tribunal pospone su intervención; en segundo lugar, el grado de claridad con que surja la ausencia o presencia de jurisdicción y, en tercer lugar, la pericia que tenga la agencia para dilucidar las cuestiones jurisdiccionales.

Estos criterios resumen los elementos que los tribunales deben tomar en consideración ante un planteamiento como éste. Apliquémoslos al caso de autos.

## III

La posposición de la intervención del Tribunal, en primer lugar, no le ocasionará un daño irreparable al señor Colón Ventura. Aunque en sus escritos aduce que la estructura que origina este litigio está deteriorándose, de los autos se desprende que él demolió la edificación original y, por ende, cualquier daño es autoinfligido.[3] En segundo lugar, y concediéndole al demandado que en efecto sufriría un daño, el perjuicio emana de las violaciones en las que él mismo incurrió de los endosos concedidos por la Autoridad, *cuya jurisdicción no impugna en este caso en particular.*[4] Como bien expresa la Procuradora General en este caso, el daño irreparable de Colón Ventura hay que evaluarlo frente al que sufre la ecología culebrense, en caso de que se determine que ésta es una de esas construcciones nocivas para la zona marítimo-terrestre. Esta es la primera razón que justifica la devolución de este pleito.

## IV

Al abordar el asunto de la jurisdicción de Recursos Naturales sobre la zona marítimo-terrestre de Culebra, lo hacemos conscientes de la oportunidad única que nos brinda esta controversia para poner de manifiesto la importancia

---

[3] Existe documentación en el expediente apelativo que parece indicar que debido a la etapa tan incipiente en que se encontraba la construcción, era dudoso tal deterioro y que aun así no causaría el daño irreparable requerido por la doctrina. Véanse: *Exhibits* III y XIII.

[4] Cabe señalar nuevamente que el endoso concedido por el Departamento de Recursos Naturales, a solicitud del propio Colón Ventura, contenía prohibiciones análogas a las contenidas en los endosos de la Autoridad. Sin embargo, como la jurisdicción de Recursos Naturales es la impugnada en este pleito, no haremos referencia a las violaciones adicionales de aquéllos.

ecológica y la gran riqueza de recursos naturales que tiene la isla municipio de Culebra. Veamos.

La isla de Culebra está ubicada a diecisiete (17) millas al este de Puerto Rico y comprende siete (7) millas a lo largo y tres y media (3½) millas a lo ancho. Probablemente fue descubierta por Cristóbal Colón en 1493, pero se especula que no fue sino hasta el siglo XIX que fuera habitada por alrededor de setecientas (700) personas. Después de la Guerra Hispanoamericana, Culebra, al igual que el resto de Puerto Rico, fue cedida mediante el Tratado de París al Gobierno de Estados Unidos.

Poco tiempo después, mediante una orden del Presidente Theodore Roosevelt, la isla de Culebra quedó bajo la jurisdicción de la fuerza naval norteamericana. Entre esa fecha y el año 1975 Culebra fue utilizada intermitentemente como punto para prácticas de tiro y bombardeo aéreo y naval. C. Feliciano Claro, *Apuntes y comentarios de la colonización y liberación de la Isla de Culebra*, Culebra, 1980, pág. 276.

No obstante, para la década de los setenta disminuyó el uso militar en la isla. También se desarrolló en Puerto Rico una intensa controversia sobre la presencia militar en esa isla. Informe Especial sobre la Instrumentación por la Marina de la Orden Ejecutiva Número 8684 del Presidente de los Estados Unidos de América sobre la Isla-Municipio de Culebra y los Derechos Civiles, Comisión de Derechos Civiles, San Juan, 1970, págs. 46–56. Gradualmente partes de Culebra fueron devueltas por las fuerzas navales a la Administración de Servicios Generales de Estados Unidos, hasta que finalmente el Secretario de la Defensa anunció que todas las operaciones militares en Culebra cesarían el 1ro de julio de 1975.

Al concluir estas actividades militares, "se inició un proceso de planificación ordenada del municipio", y se declaró a Culebra un "caso especial" para propósitos de la reglamentacón de uso de terrenos por parte de la Junta de

Planificación. *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991).

Paralelamente con estos desarrollos, otras agencias federales y grupos ambientales habían manifestado interés en la conservación y el desarrollo de los elementos naturales de Culebra. Su riqueza ecológica es excepcional. Culebra se caracteriza por su climatología seca. Posee trescientas setenta y dos (372) clases de plantas, treinta y tres (33) de las cuales se encuentran sólo en Culebra o sus islas cercanas, y tres (3) de las cuales sólo crecen en la isla. Sus bosques se distinguen por ser ricos en palmas reales. Cuenta la isla también con un extraordinario santuario de aves, algunas de ellas protegidas por estar en peligro de extinción y con unas áreas costeras donde las tortugas colocan sus huevos. *The Culebra Segment*, estudio preparado por el Departamento de Recursos Naturales para el Programa de Manejo de la Zona Costanera, pág. I-1. Culebra también tiene varias playas al norte y al este de sus costas que son únicas en el Caribe.

Además, el valor de la vida coralina culebrense no puede ser cuantificado por constituir un ecosistema sumamente complejo y productivo. Estos corales protegen a las costas, evitando su erosión, y en ellos habitan peces, langostas y moluscos. *The Culebra Segment*, supra, pág. II-1.

■ *Es precisamente por esta variedad e importancia ambiental que nos brinda la naturaleza culebrense que su ecosistema está tan intensamente reglamentado por el Estado.* Al analizar la legislación ambiental aplicable a dicha isla encontramos que, aunque hay varias agencias gubernamentales que intervienen en su reglamentación y que la Autoridad tiene amplios poderes de custodia, conservación y administración de propiedades públicas en Culebra, la coordinación y fase operacional de estos programas descansa en el Departamento de Recursos Naturales. En estas circunstancias no podemos aceptar la contención del

recurrido de que la creación de la Autoridad ha tenido el efecto de privar a Recursos Naturales de su jurisdicción sobre la zona marítimo-terrestre de Culebra. El esquema estatutario y la importancia ambiental de la isla apoyan la conclusión de que Culebra está protegida por ambas agencias aunque en facetas diversas. Veamos el origen de ellas.

## V

En primer lugar, somos conscientes que la protección y la preservación de los recursos naturales y el ambiente puertorriqueño es de tal importancia que goza de rango constitucional. Encontramos el inicio del interés en la preservación de dichos recursos en la Sec. 19 del Art. VI de la Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 379, al declararse expresamente que "[s]erá política pública del Estado Libre Asociado [de Puerto Rico] la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...". La razón de ser de estas agencias se encuentra, por lo tanto, en la propia Constitución del E.L.A.

Con esta política pública en mente la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1121 *et. seq.*, y además, creó un Departamento de Recursos Naturales "para que en dicha agencia se efectúe una centralización efectiva de las *funciones operacionales y de implementación de reglamentos concernientes a problemas ambientales* ...". (Énfasis suplido.) Informe Conjunto al Senado de Puerto Rico sobre el P. del S. 1279 de 20 de abril de 1972, 6ta Asamblea Legislativa, 4ta Sesión Ordinaria, pág. 5.

Mediante dicha pieza legislativa se le transfirió a Recursos Naturales los poderes de la Comisión de Minería, las funciones del Secretario Auxiliar a cargo de Recursos

Naturales del Departamento de Transportación y Obras Públicas, las facultades del Secretario de Transportación y Obras Públicas sobre prevención de inundaciones y conservación de ríos y playas, las actividades de la Comisión de Servicio Público relacionadas con la concesión de franquicias para el uso de las aguas públicas y el cumplimiento de la Ley de Aguas, y múltiples otras funciones relacionadas con el medio ambiente de Puerto Rico. 3 L.P.R.A. sec. 156.

 Además de las facultades que le fueron transferidas a Recursos Naturales, se le concedió la importante función de vigilar y conservar las aguas territoriales, los terrenos sumergidos bajo ellos y la zona marítimo-terrestre. Además, se le delegó el poder de conceder permisos para el uso y aprovechamiento de la zona marítimo-terrestre en todo Puerto Rico, incluyendo Culebra:

> El Secretario de Recursos Naturales tendrá ... las siguientes facultades y deberes:
>
> . . . . . . .
>
> (h) *ejercer la vigilancia y conservación de las aguas territoriales, los terrenos sumergidos bajo ellas y la zona marítimo* terrestre, conceder franquicias, permisos, y licencias de carácter público para su uso y aprovechamiento y establecer mediante reglamento los derechos a pagarse por los mismos. (Énfasis suplido.) 3 L.P.R.A. sec. 155.

 Sin embargo, impulsada por el retiro de la armada norteamericana de Culebra y debido a las necesidades particulares del medio ambiente culebrense, la Asamblea Legislativa aprobó una medida específica para el manejo y la administración de las tierras y playas que nuevamente pasaban a manos puertorriqueñas. Se creó mediante la Ley Núm. 66 de 22 de junio de 1975 una corporación pública denominada "Autoridad de Conservación y Desarrollo de Culebra", 21 L.P.R.A. secs. 890–890*l*.

 De la exposición de motivos de dicha ley se desprende que mediante la aprobación de la misma la Asam-

blea Legislativa tuvo la intención de crear una entidad adicional a las ya existentes para atender los particulares problemas que enfrenta la ecología y los recursos naturales de Culebra. El legislador dejó establecido su propósito al expresar que:

> Actualmente el municipio, la Junta de Planificación, la Junta de Calidad Ambiental, *el Departamento de Recursos Naturales y otras agencias del Gobierno,* vienen haciendo esfuerzos porque estos objetivos se logren y continuarán haciéndolo.
> Es necesario, sin embargo que, dada las características especiales de esta Isla Municipio, *se creen instrumentos adicionales que en coordinación con el municipio, las agencias e instrumentalidades del Gobierno,* concentre esfuerzos y recursos de diversa índole en ayudar a que los objetivos ya mencionados se logren plenamente.
> Este es el propósito de esta "Ley de Conservación y Desarrollo de Culebra", a saber: reconocer las características únicas de esta Isla Municipio; establecer unas políticas públicas dentro de las cuales se enmarque la conservación y el desarrollo de Culebra; y proveer un instrumento corporativo *que constituya una herramienta adicional a las ya existentes para lograr los objetivos aquí descritos.* (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 66 de 22 de junio de 1975, Leyes de Puerto Rico, pág. 168.

 La Asamblea Legislativa concedió amplios poderes a la Autoridad en la consecución de su política pública. Entre ellos se encuentra la facultad para recibir donaciones, negociar y firmar convenios o documentos con agencias federales relativas a la transferencia de título de propiedad que anteriormente estuvo bajo la jurisdicción del Gobierno de Estados Unidos, la administración de terrenos federales que se encuentren en Culebra, la conservación, custodia, desarrollo y estudio de toda clase de bienes para el disfrute de los ciudadanos de la isla y el asesoramiento de la Junta de Planes, la Junta de Calidad Ambiental y el Departamento de Recursos Naturales. 21 L.P.R.A. sec. 890d(1). La Autoridad tiene, además, el poder de dictar órdenes de hacer y de no hacer, de cese y desisti-

miento, y de celebrar vistas administrativas. 21 L.P.R.A. sec. 890d(*l*)(o). En cuanto a la zona marítimo-terrestre, la ley dispone textualmente:

> (1) La Autoridad ejercerá todos los derechos y poderes que sean necesarios o convenientes para llevar a cabo la política pública legislativa y los propósitos de las secs. 890 a 890(*l*) de este título, incluyendo, pero sin limitarse, a los siguientes:

> . . . . . . . .

> (n) aprobar, enmendar y revocar sus reglamentos para llevar a cabo la política pública y los propósitos de las secs. 890 a 890(*l*) de este título. Estos reglamentos podrán referirse entre otros asuntos a:

> . . . . . . .

> (2) el uso o aprovechamiento de las aguas superficiales; la extracción de aguas subterráneas y de materiales de la corteza terrestre; la custodia y protección de la zona marítimo-terrestre y de las aguas navegables ... 21 L.P.R.A. secs. 890d(1), 890d(1)(n) y 890d(1)(n)(2).

Surge del estatuto que la Autoridad tiene facultad, además, para reglamentar la zona marítimo-terrestre. Este hecho ¿significa que Recursos Naturales ha perdido jurisdicción para vigilar y conservar esa zona en Culebra? Resolvemos que no.

En primer lugar, la Autoridad está adscrita al Departamento de Recursos Naturales y su Secretario preside la Junta Directiva de la corporación pública. Del estatuto habilitador se desprende claramente que existe una estrecha vinculación jurídica entre ellas y que la creación de la Autoridad no ha tenido el efecto de alterar en forma alguna los poderes y funciones de Recursos Naturales.

Tampoco ha ocurrido una transferencia de poderes (como ocurrió, por ejemplo, cuando se creó Recursos Naturales) que parezca sugerir que la ley orgánica de la Autoridad tomó para ella las facultades que tiene Recursos Naturales sobre esta zona.

Un análisis integral de ambos estatutos revela que son perfectamente armonizables, en particular to-

mando en consideración que Recursos Naturales atiende la *fase operacional* de la protección de la zona marítimo-terrestre y la Autoridad se encarga del *aspecto reglamentario*. Sus facultades individuales, lejos de ser mutuamente excluyentes, se complementan para la consecución de un mismo fin: la protección de los elementos que componen el medio ambiente culebrense. Es evidente, pues, que la aprobación de dicha ley no iba dirigida a limitar o menoscabar la potestad que otras agencias gubernamentales tenían sobre Culebra.

Por otro lado, de acuerdo con el plan de manejo de la zona costanera para el segmento de Culebra, elaborado por Recursos Naturales para cumplir con el *Coastal Zone Management Act of 1972*, 16 U.S.C. secs. 1451–1464, y así poder recibir ciertos fondos federales, existe una interrelación muy estrecha entre la Junta de Planificación, la Administración de Reglamentos y Permisos, la Junta de Calidad Ambiental, Recursos Naturales y la Autoridad de Conservación y Desarrollo de Culebra.

 A la luz de este esquema agencial, la Junta de Planificación establece la política en cuanto al uso, planificación y zonificación del área costanera y reglamenta el acceso a las playas y costas de Puerto Rico, y la Administración de Reglamentos y Permisos lleva a cabo la función de conceder permisos de acuerdo con los reglamentos aprobados por la Junta de Planificación. La protección ambiental de esta zona está a cargo, por otro lado, de la Junta de Calidad Ambiental y Recursos Naturales. Entre estas dos (2) agencias existe una relación análoga a la existente entre la Junta de Planificación y A.R.Pe. Recursos Naturales, como mencionáramos previamente, tiene además poder para reglamentar la zona marítimo-terrestre.

 Específicamente en cuanto a la facultad de Recursos Naturales para conceder endosos, del texto del estatuto

y del propio alegato de la parte recurrida puede colegirse claramente que no quedó afectado con la creación de la Autoridad. El estatuto habilitador de la Autoridad, al prohibir expresamente a las agencias "aproba[r] obra o proyecto privado alguno en relación con la Isla de Culebra que conflija con los planes y políticas formuladas y adoptadas por la Autoridad" y al requerir "un endoso favorable de la Autoridad" (21 L.P.R.A. sec. 890e, según enmendada) está reconociéndole participación a las otras agencias para aprobar proyectos. Del hecho de que la ley requiera un endoso adicional al de la Autoridad no puede concluirse razonablemente que tuvo el efecto de despojar a Recursos Naturales de su facultad estatutaria para conceder los referidos permisos.

▇▇▇ Todo lo contrario. Una razón adicional para interpretar que la facultad para custodiar y proteger la zona marítima de Culebra no es exclusiva de la Autoridad es que la propia agencia al interpretar sus facultades así lo ha reconocido en el endoso condicionado concedido. Esta conclusión encuentra apoyo en la norma de que las interpretaciones que las agencias hagan de sus propias facultades merece gran deferencia si son razonables y compatibles con su propósito legislativo. *Vázquez v. A.R.P.E.*, 128 D.P.R. 513 (1991); *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669 (1987); *Tormos & D.A.C.O. v. F.R. Technology*, 116 D.P.R. 153 (1985).

La naturaleza y las necesidades particulares de la ecología culebrense justifican un cedazo adicional para el que interese realizar un proyecto en la isla. Aunque estamos de acuerdo con la posición de la parte recurrida a los efectos de que la Autoridad tiene la facultad de custodiar y proteger la zona marítimo-terrestre de la isla de Culebra, no podemos adoptar su posición de que la misma es exclusiva. La exposición de motivos de la ley orgánica de la Autoridad

y el esquema estatutario evidencian un propósito legislativo de cooperación y colaboración con las otras agencias ambientales.

## VI

Ahora bien, ¿está la estructura que genera esta controversia en una zona marítimo-terrestre? La interrogante planteada y los demás señalamientos *nos mueven a concluir que si bien es cierto que Recursos Naturales tiene jurisdicción para dilucidar esa controversia* no está meridianamente claro si estamos en un área comprendida por la zona marítimo-terrestre. Por esta razón, hay una variedad de factores a considerar en relación con la controversia que aconsejan sean precisados en su origen por Recursos Naturales.

No cabe duda que para aclarar el ámbito de su jurisdicción, la pericia de Recursos Naturales es necesaria. Por esta razón consideramos que todos los pronunciamientos emitidos por el tribunal de instancia fueron prematuros. Al no haberse agotado el trámite administrativo y sin el beneficio de una determinación de una entidad experta en dichos asuntos, el foro de instancia debió haber pospuesto su intervención.

Es precisamente por esta intervención a destiempo que el tribunal tuvo que fundamentar su determinación de que la casa no estaba localizada en una zona marítimo-terrestre en que la parte demandada "no presentó prueba alguna que pudiera establecer que la estructura objeto de reparación ubica en zona marítimo terrestre, ni para sostener la alegada jurisdicción del Departamento de Recursos Naturales sobre la zona marítimo terrestre de la isla municipio de Culebra". Al no contar con el beneficio de una determinación previa de la agencia especializada, porque no se agotaron los remedios

administrativos, la labor apelativa a todos los niveles resulta sumamente difícil y crea un riesgo de error mucho mayor que si se contase con el beneficio de la opinión de una entidad gubernamental con peritaje. Era necesario, en conclusión, que culminara el trámite administrativo.

■ Recordemos que cualquier error interpretativo de la agencia estará sujeto a ser revisado judicialmente y puede ser subsanado en una etapa posterior del proceso. El litigante, por lo tanto, no queda desprotegido, de ocurrir una arbitrariedad en la agencia.

## VII

En conclusión y tomando en consideración los tres (3) factores expuestos a la luz de los particulares hechos de este caso, resolvemos que Recursos Naturales tenía jurisdicción para conceder permisos para el uso y aprovechamiento de los terrenos localizados en la zona marítimo-terrestre y que Colón Ventura tenía que agotar los remedios administrativos antes de recurrir al foro judicial. Por lo tanto, el tribunal de instancia actuó prematuramente al declarar con lugar el *injunction.*

Por las razones expuestas anteriormente, *se dictará sentencia para revocar el dictamen recurrido y se remitirá el caso Recursos Naturales para que continúen los procedimientos.*