LIGIA M. ORTIZ RIVERA y HÉCTOR R. ORTIZ RIVERA, recurridos, *v.* PANEL SOBRE EL FISCAL ESPECIAL INDEPENDIENTE, LIC. MANUEL REYES SERRANO, LIC. ENRIQUE RIVERA SANTANA y LIC. JOSÉ ORLANDO GRAU, recurrente.

*Número:* CC-1998-249 *Resuelto:* 8 de octubre de 2001

*Guillermo Garau Díaz* y *Gilberto Vilá Navarrete*, Fiscales Especiales Independientes, representantes de los peticionarios; *José Juan Nazario De La Rosa* y *Juan Santiago Nieves*, de *Nazario & Santiago*, abogados de la parte recurrida; *Fernando Olivero Barreto*, abogado del interventor.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

Nuevamente nos enfrentamos a una controversia acerca del derecho que tienen los ciudadanos a obtener información en manos del Gobierno, esta vez en su dimensión procesal. En específico, el presente caso nos provee la oportunidad de expresar y aclarar cuál es el foro que posee jurisdicción primaria para adjudicar controversias relativas a dicho derecho: el foro administrativo o el judicial. Veamos.

I

El 9 de diciembre de 1992 la Sra. Ligia M. Ortiz Rivera y el Sr. Héctor R. Ortiz Rivera (en adelante recurridos) iniciaron un trámite ante el Secretario de Justicia para que se nombrara un Fiscal Especial Independiente (en adelante FEI), al amparo de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z (en adelante Ley Núm. 2)). En su escrito titulado "Querella Jurada y Solicitud de la Designación de un Fiscal Especial Independiente", los recurridos hicieron una serie de imputaciones de conducta grave contra un ex juez, el Hon. Fernando Campoamor Redín (o el querellado).[1] Asimismo, se alegó específicamente

_____

[1] En síntesis, la querella le imputaba al ex juez Fernando Campoamor Redín (o el querellado), *inter alia*, haber movido ilegalmente las verjas que marcaban la colindancia entre una finca propiedad suya y una finca propiedad de la Sucesión Ortiz-Rivera (de la cual los recurridos forman parte); haberse apropiado de dos mil (2,000) metros cuadrados de la finca perteneciente a dicha sucesión; apropiarse ilegalmente de un tanque perteneciente a la Sucesión y utilizar el agua para su propio negocio; haberse apropiado ilegalmente de más de trece mil (13,000) yardas cúbicas de material de relleno, tomadas de una ladera de una montaña en la finca perteneciente a la Sucesión, alegadamente valoradas en setenta mil dólares ($70,000); ha-

que el querellado había " 'utilizado y obtenido ventaja de su posición como Juez Superior', utilizando 'su autoridad, influencia y reconocimiento como tal" al llevar a cabo ciertos actos ilegales. Apéndice, pág. 62. Por último, se alegó que luego de que los recurridos presentaran una demanda civil en contra del querellado por los hechos imputados en la querella, éste intervino ilegalmente en los procedimientos judiciales " 'alterando la minuta del 24 de septiembre de 1992' ". Íd.

El 31 de diciembre de 1992 el Secretario de Justicia Interino le informó a los recurridos mediante carta que se había efectuado una "investigación preliminar de rigor" conforme a lo dispuesto en la Ley Núm. 2. En la carta se indicó que, a la luz de los resultados de la investigación preliminar, solicitaría al Panel sobre Fiscal Especial Independiente (en adelante el PFEI o el Panel) el nombramiento de un FEI para efectuar una investigación en su fondo indicando *que la prueba recopilada constituye causa suficiente para creer que el Juez Fernando Campoamor Redín ha incurrido en la comisión de delitos ... contemplados en [la] ley.*" (Énfasis suplido.) Apéndice, pág. 63. Consecuentemente, el Panel nombró al Lic. Federico Torres Jiménez como FEI del caso.

No obstante, al cabo de un (1) año, el 3 de diciembre de 1993, el FEI designado rindió su informe al Panel en el cual concluyó que no procedía instar acción penal alguna contra el querellado.[2]

---

berse apropiado ilegalmente y para beneficio propio de unos mil quinientos (1,500) metros cuadrados de grama, alegadamente removidos de la finca propiedad de la Sucesión; haber utilizado ilegítimamente la finca de la Sucesión para cavar tres (3) grandes trincheras de unos seil mil (6,000) pies cúbicos cada una para enterrar pollos muertos de su negocio, a pesar de que en una ocasión previa cuando hizo otra trinchera, un miembro de la Sucesión se quejó de ello, y el ex juez se comprometió a no repetir tal actuación. Apéndice, págs. 61–62.

[2] En su informe, el Fiscal Especial Independiente (en adelante FEI) dio múltiples razones para justificar su conclusión, tales como la prescripción de los delitos, la falta de prueba suficiente, la ausencia de "intención criminal" y la ausencia de todos los elementos del tipo delictivo, entre otras. Apéndice, págs. 63–66. En cuanto a la imputación de que el querellado había alterado la minuta en un caso civil en el cual él era parte demandada, el informe del FEI concluye que " 'aunque es incontes-

El 9 de diciembre de 1993, el Presidente del Panel remitió a los recurridos copia del informe final del FEI. El 15 de diciembre de 1993, los abogados de los recurridos cursaron al Panel una carta mediante la cual solicitaban reconsideración de la determinación del FEI. Solicitaron, además, que el Panel les indicara cuál era " 'el procedimiento a seguir para canalizar su solicitud de reconsideración' ". Apéndice, pág. 67. Por último, solicitaron que se les permitiera " 'examinar la totalidad del expediente [del] fiscal, así como toda la información obtenida durante el curso de [la] investigación".(3) Íd.

El 24 de diciembre de 1993 la Directora Ejecutiva del Panel le informó a los recurridos mediante carta que, debido a que un miembro del Panel se encontraba enfermo, su petición de 15 de diciembre de 1993 sería discutida en una reunión posterior del Panel.(4) Varias semanas transcurrieron hasta que, finalmente, el 3 de febrero de 1994, el Panel le envió una comunicación escrita a los recurridos, informándole que se denegaba su solicitud de 15 de diciembre " 'porque la reconsideración de la decisión del Fiscal Especial Independiente limitaría y vulneraría la independencia de dicho funcionario' ". Apéndice, pág. 67.

Conforme a la Ley de Judicatura vigente en aquel momento, el 7 de marzo de 1994, los recurridos acudieron al Tribunal Superior mediante un recurso de revisión.(5) El recurso tenía el propósito de que se revisara la actuación del Panel, primero, por éste no haber ordenado la "reinvestigación" de la querella "de forma adecuada"; y segundo,

---

table la intervención indebida del Juez Campoamor respecto al documento' " (Apéndice, pág. 66), no se infringió disposición penal alguna pues el documento alterado no era la minuta final, sino solamente un borrador de minuta. En todo caso, concluye el informe, hubo una " 'posible violación a la ética judicial ...' ". Íd.

(3) Cabe señalar que, posteriormente, el 29 de diciembre de 1993, los recurridos presentaron otro escrito de reconsideración más extenso y detallado. Apéndice, pág. 67.

(4) Apéndice, pág. 67.

(5) Sabido es que previo a la Reforma Judicial de 1994, el foro con jurisdicción para revisar las actuaciones de las agencias administrativas era el Tribunal Superior.

por no haber "relevado" al FEI que rindió el informe y nombrado a otro con el propósito de que "hiciera una [segunda] investigación adecuada y determinara luego de la misma si se debía o no presentar denuncias contra el Juez Campoamor". Apéndice, pág. 68.([6])

En su Sentencia de 8 de agosto de 1994, el Tribunal de Superior([7]) llegó a las siguientes conclusiones de hecho, que estimamos pertinentes al caso de autos:

> Una lectura del informe que rindió el FEI al Panel ... revela que la labor investigativa del FEI en este caso fue *seriamente defectuosa*, y que el razonamiento en que descansó el FEI para justificar su decisión de no presentar denuncias criminales contra el juez querellado contiene *graves errores de derecho.* ...
>
> . . . . . . .
>
> En definitiva, no vemos cómo un FEI en este o cualquier otro caso similar pueda *abdicar totalmente su responsabilidad de hacer una investigación independiente y adecuada* de los hechos que motivaron la querella ante su consideración, y se pueda conformar con descansar en la evidencia y las determinaciones de hecho de un pleito civil contra la misma parte querellada.

A la luz de todo lo anterior, nos parece inevitable la conclusión de que la "investigación" llevada a cabo por el FEI en este

---

([6]) Resulta sumamente importante y pertinente aclarar cuál es el alcance de la revisión que pretendían los recurridos. A tales efectos, citamos la Sentencia del Tribunal de Primera Instancia de 8 de agosto de 1994:

"Aunque los [recurridos] argumentan enfáticamente ante el Tribunal que el informe del FEI Torres Jiménez está plagado de errores de derecho, ellos hicieron claro durante la vista que se celebró el 11 [de] marzo [de] 1994 que *no pretenden en forma alguna que el Tribunal revise directamente las actuaciones del FEI, y menos que le ordene al FEI el presentar cargos criminales contra el Juez Campoamor.* Su posición más bien es que el Panel sobre el FEI tiene un poder general para *supervisar* las actuaciones de cualquier FEI nombrado por el propio Panel, y que las serias críticas que ellos hicieron ante el Panel contra el informe del FEI en este caso debieron mover al Panel a ejercitar ese poder supervisor[;] que el Panel como mínimo *debió haber ordenado al FEI reinvestigar la querella en forma adecuada* y luego reconsiderar su decisión de no formular denuncias contra el juez querellado, y (más aun) que el Panel incluso *debió haber relevado al Lic. Torres Jiménez como FEI en este caso, nombrando entonces otro FEI para que hiciera una investigación adecuada* y determinara luego de la misma si se debía o no presentar denuncias contra el Juez Campoamor. *Argumentan entonces que el Tribunal puede revisar la decisión del Panel de no tomar ninguna de esas medidas.*" Apéndice, págs. 67–68.

([7]) Hon. Ángel G. Hermida, Juez Superior.

caso fue *seriamente deficiente, por no decir torcida*, que dicha deficiencia resulta totalmente *inexplicable*, y que el FEI no ha ofrecido ninguna justificación adecuada de su *extraño comportamiento.*

Aparte de lo anterior, *encontramos gravísimos errores de derecho* en el razonamiento que contiene el informe del FEI, en el cual éste descansó para concluir que el juez querellado no había incurrido en el delito de apropiación ilegal agravada.

. . . . . . . . . .

[*N*]*o es válido*, como pretende el FEI en su informe, *inferir la ausencia de intención criminal, y por tanto la ausencia de responsabilidad penal*, por el mero hecho de que en este caso unos actos objetivamente constitutivos de delito fueron cometidos en forma abierta. (Énfasis suplido y en el original.) Apéndice, pág. 69–75.

Si bien el Tribunal Superior llegó a la conclusión de que la labor investigativa del FEI fue "seriamente defectuosa" y "torcida", y que su informe contiene "inexplicables omisiones y graves errores de derecho" (Apéndice, pág. 81), no obstante, concluyó que los recurridos carecían de legitimación activa (*standing*) para solicitarle a un tribunal que obligase al Panel "a tomar medidas contra el FEI" (íd.); en particular, para solicitar que se obligara al Panel a nombrar un nuevo FEI en el caso, y ordenase una reinvestigación "adecuada".([8]) Por tal razón, a pesar de su extensa sentencia, denegó la expedición del auto de revisión solicitado por los recurridos.([9])

De esa determinación, los recurridos acudieron ante nos mediante petición de *certiorari*. El 29 de noviembre de

---

([8]) Apéndice, pág. 81.

([9]) Irónicamente, el juez de instancia admitió lo desafortunado de su decisión:

"Reconocemos que ... puede quedar la impresión de que el resultado de este caso es en gran medida contrario al espíritu de la ley que crea el cargo del FEI. Después de todo, una de las principales razones de ser de dicha ley es evitar siquiera la apariencia de que los funcionarios de gobierno de ... influencia pueden cometer delitos impunemente, pues los encargados de acusarlos no se atreven hacerlo." (Escolio omitido.) Apéndice, págs. 83–84.

1994, este Tribunal emitió una resolución para denegar la expedición del recurso presentado.([10])

En el ínterin, los recurridos habían solicitado reconsideración al Tribunal Superior. Una vez recibida copia de la Resolución del Tribunal Supremo, los recurridos solicitaron *nuevamente* el obtener acceso al expediente investigativo. Mediante Orden de 28 de abril de 1995, el tribunal de instancia declaró sin lugar la reconsideración, sin perjuicio de que solicitasen acceso *directamente* al Panel, *y de denegarse lo solicitado, éstos acudiesen entonces al Tribunal en "un nuevo recurso de revisión judicial con relación a dicho asunto únicamente"*.([11]) (Énfasis suplido.) Apéndice, pág. 59.

Así las cosas, los recurridos acudieron al Panel para solicitar, *una vez más*, acceso al expediente investigativo del ex juez Campoamor Redín. El 21 de junio de 1995, y nuevamente, el Panel denegó la petición mediante una carta, aclarando, específicamente, que la solicitud "carece de fundamentos *a la luz de los criterios establecidos por el Artículo 16 de la Ley 2* de 23 de febrero de 1988 ...". (Énfasis suplido.) Apéndice, págs. 49–50.

El 10 de julio de 1995, los recurridos le enviaron nuevamente otra carta al Panel, mediante la cual solicitaron "reconsideración" de su última denegación. Estimamos oportuno transcribir parcialmente el contenido de dicha comunicación:

> En innumerables ocasiones previas hemos expuesto las razones que motivan nuestra solicitud de acceso a información
> ....

---

([10]) Apéndice, pág. 154.

([11]) Adicionalmente, el 22 de mayo de 1995, los recurridos solicitaron nuevamente reconsideración de la orden del tribunal de instancia de 28 de abril de 1995. Ésta fue declarada sin lugar por el tribunal de instancia el 30 de mayo de 1995, mediante otra orden, apuntalando que los recurridos no establecieron justificación para su solicitud, añadiendo, que la "mera curiosidad" no constituye justificación adecuada para lograr acceso al expediente investigativo en cuestión. Apéndice, págs. 133–135.

Indica su comunicación que nuestra solicitud carece de fundamentos a la luz de los criterios establecidos por el Artículo 16 de la Ley Núm. 2 .... Nos parece que esta interpretación del Artículo 16 adolece de serios defectos constitucionales e impone una carga de la prueba sobre el solicitante de la información que, por razón de no tener acceso a los documentos que solicita, no podrá ser descargada adecuadamente.

Contrario a lo expuesto en su comunicación, conforme [a]l Artículo 16 y su interpretación ... constitucional vigente, corresponde al Panel ofrecer acceso a toda la información bajo su control a menos que pueda demostrar que se encuentra presente alguna de las excepciones o reclamos de confidencialidad constitucionalmente reconocidos que rebase el umbral exigido por el derecho constitucional de acceso a información gubernamental. En su comunicación, el Panel deja de exponer detalladamente sus objeciones o reclamos de confidencialidad a aquellos documentos o información específica en el expediente que entienda se encuentran protegidos o cuya divulgación sea contraria al Art. 16.

Conforme [a]l derecho vigente en nuestra jurisdicción, el derecho del pueblo a tener acceso a información en poder del Estado, de jerarquía constitucional, se interpretará liberalmente a favor del ciudadano y restrictivamente en cuanto a sus limitaciones y exclusiones, mediante un escrutinio acucioso de los intereses apremiantes que se pretenden preservar al mantener la confidencialidad de la información[.]

. . . . . . . .

*Habiendo terminado en el caso de referencia la investigación del Fiscal Especial, rendido su Informe Final, denegada la revisión de la decisión del PFEI y denegado el recurso apelativo para revisar aquella denegatoria, devuelto el mandato, no existiendo la posibilidad del nombramiento de un nuevo Fiscal Especial y no quedando pendientes asuntos sobre esta investigación, aplican en toda su fortaleza los principios constitucionales que otorgan al ciudadano acceso a información bajo el control gubernamental.*

*Nuestra solicitud de acceso a información es cónsona con los propósitos de la Ley Núm. 2, dirigida a "restaurar la confianza del pueblo en su gobierno y en sus servidores públicos". El acceso a la información en poder del PFEI es el único medio para que la ciudadanía pase juicio sobre la adecuacidad [sic] de sus procedimientos y ejecutorias....* (Énfasis suplido y citas omitidas.) Apéndice, pág. 52–54.

A esta carta respondió el Panel, el 10 de agosto de 1995, indicando que

... el derecho de la ciudadanía a acceso a la información investigativa bajo la [Ley Núm. 2] es invocable [sic] cuando no aplican los criterios establecidos por el Artículo 16 de la Ley Número 2 ... por vía de excepción, cuando el Panel determina que la divulgación no tendrá las consecuencias enumeradas en los seis subincisos del artículo. La obligación del Panel de proteger la información en el transcurso de una investigación criminal es tan significativa que la misma ley autoriza al Gobernador del Estado Libre Asociado de Puerto Rico destituir a los Miembros por "hacer público un informe cuya divulgación no está autorizada por esta Ley." Artículo 17.

Al Panel se le prohíbe divulgar información de los expedientes investigativos a menos que se determine, *inter alia,* que no constituye una intromisión irrazonable en la privacidad, y que no expone al público técnicas o procedimientos investigativos que afecten el curso de estas investigaciones.

... [S]e desprende que el propósito en solicitar acceso al expediente del Lcdo. Fernando Campoamor Redín está dirigida [sic] a "que la ciudadanía pase juicio sobre la adecuacidad [sic] de sus [del Panel] procedimientos y ejecutorias". La misma ley basada en el modelo federal de proteger las técnicas investigativas [sic] del Negociado de Investigaciones Federales (el "F.B.I.") expresamente prohíbe exponer al público las técnicas y procedimientos investigativos. Además, se nos imposibilita determinar, basado en las razones que fundamentan su solicitud, que el acceso al expediente investigativo no constituya una intromisión irrazonable en la privacidad del investigado. (Citas omitidas y corchetes suplidos y en el original.) Apéndice, págs. 55–56.[12]

Por segunda ocasión, los recurridos presentaron el 8 de septiembre de 1995 una petición de "revisión" ante el Tribunal Superior de San Juan.

Mientras tanto, la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces emitió una resolución el 25 de enero de 1996, determinando que la

---

[12] Mediante este escrito, claramente, el Panel sobre Fiscal Especial Independiente (en adelante PFEI o el Panel) intimó que las excepciones del Art. 16 de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. sec. 99w) aplicables al caso de autos, son los incisos (c) y (e). Véase 3 L.P.R.A. sec. 99w(c) y (e). A saber, el inciso (c) impide al Panel dar acceso a su expediente en aquellos casos en que ello pueda crear una *intromisión irrazonable en la privacidad del investigado,* y el inciso (e) lo impide cuando dar acceso al expediente pueda exponer al público técnicas o procedimientos investigativos que afecten el curso de este tipo de investigación.

conducta observada por el juez Campoamor Redín "cierta-
mente" fue constitutiva de " 'violaciones al Código Penal,
por los delitos de apropiación ilegal agravada, usurpación,
y daños agravados' ".(13) Apéndice, pág. 159.

Luego de varios trámites procesales, el tribunal de ins-
tancia emitió una "orden" el 30 de abril de 1996, dictami-
nándole al Panel que elevara el expediente de la investiga-
ción relativa al juez Campoamor Redín. Justificó su
determinación citando la jurisprudencia(14) que indica que
para que un tribunal pueda evaluar un reclamo de esta
índole, es necesario que sea el mismo tribunal el que exa-
mine en cámara los documentos que el Panel alega que son
privilegiados. Apéndice, págs. 160–161.

Así las cosas, el recurso de revisión iniciado en el Tribu-
nal Superior fue referido al Tribunal de Circuito de Apela-
ciones por orden administrativa de 19 de junio de 1996, y
conforme a la nueva Ley de la Judicatura. Véase 4 L.P.R.A.
23f. Oportunamente, el 10 de marzo de 1997, el Tribunal
de Circuito de Apelaciones (en adelante TCA), mediante
resolución, determinó que procedía "darle validez y efecto a
la orden dictada el 30 de abril de 1996, por el Tribunal de
Primera Instancia ...".(15) Apéndice, pág. 167. En su reso-
lución, además, el TCA dispuso que examinaría los docu-
mentos "en privado" y determinaría si las razones ofrecidas
por el Panel para negar acceso de los documentos, se justi-
ficaban o no, tomando en consideración lo dispuesto en el
Art. 16(2)(c) y (e) de la Ley Núm. 2. Por último, el TCA
concluyó expresando lo siguiente: "Es ahora, ante *este* Foro
que existe la posibilidad de una decisión concediendo la

---

(13) Véase el Apéndice, pág. 159, y el Anejo 1 que acompañan el Alegato del
recurrido en el caso de autos.

(14) *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 162 (1986), y casos allí
citados.

(15) Resolución de 10 de marzo de 1997, dictada por el Panel integrado por su
presidente, Juez Sánchez Martínez, y los Jueces Broco Oliveras y Urgell Cuebas.
Apéndice, págs. 165–168.

solicitud de los [recurridos]." (Énfasis suplido.) Apéndice, pág. 168.

Finalmente, luego de varios trámites apelativos, el TCA decidió *denegar el auto de revisión judicial* mediante resolución, el 15 de enero de 1998.[16] En su resolución, *resolvió* que el recurso de revisión judicial de una decisión administrativa *"no es el apropiado para adjudicar una solicitud para obtener la información relacionada a la investigación conducida por el PFEI ..."*. (Énfasis suplido.) Apéndice, pág. 03.

Para justificar su decisión el TCA expuso como fundamento que su jurisdicción revisora administrativa de la denegación del Panel dependía, en primer lugar, de que éste haya emitido una "orden o resolución final" administrativa;[17] y, en segundo lugar, que dicha orden o resolución final del Panel fuese emitida luego de haberse celebrado un procedimiento adjudicativo formal administrativo que estuviese legítimamente enmarcado dentro de la jurisdicción, competencia y autoridad estatutaria del Panel. Concluyó finalmente que no tenía jurisdicción para revisar judicialmente la denegación del Panel debido a que las cartas que impedían el acceso a los documentos solicitados no cumplían con la definición de "orden o resolución final" administrativa; es decir, no incluían conclusiones de hechos y derecho. Añadió, además, que el Panel en momento alguno celebró vista formal adjudicativa para resolver la solicitud de los recurridos, pero que tampoco podía hacerlo legítimamente en este caso ya que su determinación no surgió como parte de la ejecución de una investigación cri-

---

[16] El Tribunal de Circuito de Apelaciones (en adelante TCA) le concedió la oportunidad al ex Juez Campoamor Redín a efectuar una comparecencia especial en el caso de autos. En esencia, el licenciado Campoamor Redín adujo que es a él a quien le corresponde proteger su derecho a la intimidad y que sólo él puede renunciar a éste.

[17] El TCA definió "orden o resolución final" como una determinación administrativa que, en esencia, incluye "unas determinaciones de hecho y las conclusiones de derecho de la decisión" tomada que, a su vez, advierta a la parte adversamente afectada "del derecho a solicitar una reconsideración". *J. Exam. Tec. Méd. v. Elías et al.*, 144 D.P.R. 483, 489–490 (1997).

minal o de un procesamiento criminal que, según el TCA, es la única función para la cual le encomienda o concede autoridad la ley orgánica del Panel. En otras palabras, concluyó que un procedimiento adjudicativo formal sobre ese asunto no está legítimamente enmarcado dentro de la jurisdicción, competencia y autoridad estatutaria del Panel.

Por último, el TCA subrayó que la resolución del caso de marras "requiere el examen y evaluación de los documentos del expediente por un organismo independiente, pues hay que pasar juicio sobre éstos y determinar si deben mantenerse confidenciales .... [Y e]n este proceso es necesario recibir y evaluar, *en instancia primera*, la prueba de las partes". (Énfasis suplido y escolio omitido.) Apéndice, págs. 08–09. Añadió que ni la Ley de la Judicatura ni la doctrina jurídica sobre la naturaleza de los procedimientos apelativos, ni el Reglamento del TCA disponen para que éste reciba prueba directamente, salvo en los casos de *habeas corpus* y *mandamus*.[18] "Al contrario ... nuestra función se limita a resolver si la determinación judicial o administrativa es correcta en derecho. El [TPI], como tribunal de jurisdicción general, es el ente idóneo para recibir y evaluar la prueba de las partes." Apéndice, pág. 09. Concluyó, por lo tanto, que lo procedente era remitir el caso al Tribunal de Primera Instancia (o TPI) "para que éste entienda en la controversia como un juicio *de novo*, reciba la evidencia, formule las determinaciones de hechos y conclusiones de derecho requeridas y adjudique los derechos que le correspondan a las partes". Apéndice, pág. 10.

> En resumen, la controversia suscitada por las partes no cualifica para adjudicación por este Foro apelativo, un recurso de revisión judicial sobre decisión administrativa, ya que no es una revisión de una orden o resolución dictada en el ejercicio

---

[18] Un tribunal apelativo no puede admitir prueba presentada por vez primera ante dicho tribunal. *Catoni v. Aybar*, 60 D.P.R. 645 (1942); R. Hernández Colón, *Derecho Procesal Civil*, San Juan, Ed. Michie, 1997, Sec. 5112, pág. 327.

de la autoridad concedida al PFEI por su ley habilitadora, ni existe un récord evidenciario creado al nivel administrativo sobre el cual podamos basar nuestra revisión. En adición, nos es persuasivo que bajo el [*Freedom of Information Act*],([19]) ... las controversias sobre acceso a información se dilucidan mediante juicio *de novo* ante los tribunales de primera instancia y no ante las cortes apelativas. Apéndice, pág. 11.

Devolvió, por lo tanto, el caso al Tribunal de Primera Instancia indicando que aunque de ordinario lo procedente era desestimar el caso, sin embargo, "en consideración del historial procesal" (Apéndice, pág. 12) del mismo, lo devolvería al Tribunal de Primera Instancia para ser ventilado por juicio *de novo*. No obstante su determinación de no expedir el auto de revisión judicial, el TCA incorporó a su resolución una exposición jurídica sumamente extensa, discutiendo, entre otras cosas, el alcance del Art. 16 de la Ley Núm. 2 (3 L.P.R.A. sec. 99w).([20])

De esta determinación acudió oportunamente ante nos el Panel, el 6 de abril de 1998, mediante recurso de *certiorari*.([21]) Expedimos el auto el 19 de junio de 1998.

---

([19]) 5 U.S.C.A. sec. 552 *et seq.* (en adelante FOIA).

([20]) El TCA comenzó su exposición indicando que:

"Toda vez que estamos refiriendo el caso al Tribunal de Primera Instancia para su consideración y, dado el hecho de que entre las partes se han suscitado criterios conflictivos sobre los procedimientos a seguirse para la aplicabilidad de las excepciones incluidas en el Art. 16 [de la Ley Núm. 2], *es prudente que expongamos el estado de las doctrinas jurídicas aplicables, de manera que sirvan de guía a dicho foro en su ulterior consideración del caso*, se [sic] pueda determinar cuáles documentos, o partes de éstos, deben mantenerse confidenciales. *Por eso es necesario establecer un procedimiento* para que se identifiquen apropiadamente los mismos por el PFEI." (Énfasis suplido.) Apéndice, pág. 12.

([21]) La parte peticionaria señaló la comisión de dos (2) errores:

"*Primer Error*: Incidió el Honorable Tribunal de Circuito de Apelaciones, al exponer unas directrices o guías a seguirse en un juicio de novo, aún [sic] cuando no existía una controversia real, por éste carecer de jurisdicción para entender en los méritos del recurso. Además, esas directrices constituyen una mera opinión consultiva, que afectan los derechos o prerrogativas de la Rama Legislativa, lo cual es impermisible [sic] en nuestro Sistema de Derecho Constitucional vigente.

"*Segundo Error*: Incidió el Honorable Tribunal de Circuito de Apelaciones, al no resolver que bajo la doctrina constitucional de acceso a información y/o documentos, existe una exclusión de divulgación pública en un expediente relacionado con una investigación legítima de naturaleza criminal bajo el Artículo 16, de la Ley del Fiscal Especial Independiente, 3 L.P.R.A. [sec.] 99w, y[el] Freedom of Information Act (FOIA), 5 U.S.C. [sec.] 552." Petición de *certiorari*, págs. 7–8.

Habiendo comparecido las partes con sus respectivos alegatos, procedemos a resolver.

## II

De entrada es importante notar la evidente indisposición demostrada por el Panel y el TPI de entender la solicitud de los recurridos apropiadamente, a lo largo de este litigio. En vista de que el TCA entendió procedente denegar el auto de revisión judicial y devolver el caso al TPI para ser resuelto en sus méritos, entendemos necesario aclarar, determinar y resolver cuál es el foro que en realidad posee jurisdicción primaria para adjudicar la solicitud de los recurridos: el foro administrativo o el judicial.

### A. *Naturaleza del Panel*

Debemos resolver primero si el Panel constituye propiamente un foro administrativo, o sea, si puede considerarse como una "agencia", según lo define la Ley de Procedimiento Administrativo Uniforme (en adelante LPAU).[22] Veamos.

El Panel es foro u organismo independiente, adscrito al Departamento de Justicia, cuyas funciones se circunscriben básicamente a designar y nombrar Fiscales Especiales en los casos aplicables,[23] determinar la jurisdicción de éstos,[24] y supervisarlos debidamente para que éstos cumplan sus encomiendas en término y de manera competente.[25] La Ley Núm. 2 indica que el Panel fue creado con el fin de "erradicar y penalizar cualquier comportamiento delictuoso o indebido por cualquier funcionario gubernamental [y, a su vez] garantiza[r] la absoluta

---

[22] 3 L.P.R.A. sec. 2101 *et seq.*

[23] 3 L.P.R.A. sec. 99r(1).

[24] 3 L.P.R.A. sec. 99r(2) y (3).

[25] 3 L.P.R.A. sec. 99s(5).

objetividad de investigaciones contra altos funcionarios del Gobierno". Exposición de Motivos de la Ley Núm. 2 (1988 Leyes de Puerto Rico 5, 6).

> El mecanismo de Fiscal Especial Independiente, *bajo la supervisión de un Panel nombrado por el Gobernador del Estado Libre Asociado de Puerto Rico y compuesto exclusivamente por Ex Jueces del Tribunal Supremo o Superior o de ambos, garantiza la absoluta objetividad de investigaciones contra altos funcionarios del Gobierno.* De igual importancia, la institución del Fiscal Especial Independiente y del Panel provee un foro neutral e independiente para dilucidar palpablemente ante el pueblo supuestos o reales actos indebidos atribuibles a funcionarios gubernamentales, creándole así a funcionarios honestos un medio efectivo para preservar su integridad y reputación. (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 2, *supra*.

■ Básicamente, el Panel entra en función de dos maneras. Primero, entra en función cuando, luego de que el Secretario (o la Secretaria) de Justicia lleve a cabo una "investigación preliminar", haga la determinación de que existe causa suficiente para creer que un funcionario gubernamental ha cometido delito,[26] basándose en información obtenida bajo juramento. El Secretario luego rinde un informe detallando su investigación al Panel, haciéndole una recomendación sobre si procede o no la designación de un FEI. El Secretario viene también obligado a referirle al Panel el expediente completo del caso. *El Panel entonces tiene discreción para nombrar un FEI y ordenar la investigación.* 3 L.P.R.A. secs. 99k(1) y (2), 99l y 99r(1)(a). Segundo, bajo ciertas circunstancias, la ley le concede discreción al Panel para que —sin previa intervención del Secretario o Secretaria de Justicia— nombre a un FEI, siempre que el Panel haya obtenido la información que da base al nombramiento del FEI de una "fuente de alta credibilidad". Véase 3 L.P.R.A. secs. 99m, 99p y 99r(1)(c).

---

[26] Esto es, por cometer "cualquier delito grave y menos grave incluido en la misma transacción o evento[;] y los delitos contra los derechos civiles, la función pública y el erario público ...". 3 L.P.R.A. sec. 99k(1).

■ La LPAU define el término "agencia" como sigue:

(a) *Agencia.*—Significa cualquier junta, cuerpo, tribunal examinador, corporación pública, comisión, oficina independiente, división, administración, negociado, departamento, autoridad, funcionario, persona, entidad o cualquier instrumentalidad del Estado Libre Asociado de Puerto Rico u organismo administrativo *autorizado por ley a llevar a cabo funciones* de reglamentar, investigar, o que pueda emitir una decisión, o con facultades para expedir licencias, certificados, permisos, concesiones, acreditaciones, privilegios, franquicias, acusar o adjudicar .... (Énfasis suplido.) 3 L.P.R.A. sec. 2102(a).

■ Según la antes citada sección, puede apreciarse que la definición del término "agencia" es una sumamente amplia. De hecho, es tan amplia que prácticamente cobija a todas y cada una de las agencias administrativas del Estado Libre Asociado, "las cuales se encuentran ubicadas en la rama ejecutiva del gobierno". D. Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme,* 2da ed., Colombia, Ed. Forum, 2001, Sec. 1.1, pág. 9. Surge asimismo que la determinación de si un foro es o no una "agencia" claramente gira en torno a las funciones que esté legalmente *"autorizada"* a llevar a cabo.[27] Es decir, la disyuntiva de si una agencia, cuerpo, instrumentalidad, funcionario, oficina, etc., debe ser o no considerada una "agencia", ha de resolverse en atención a la *autoridad* legal que tiene para actuar o disponer de un asunto de manera final y obligatoria. *Davis and Pierce, Administrative Law Treatise* Sec. 1.2. (1999). Resolvemos que el Panel es una "agencia" según definido por la LPAU. Ello, en vista de que el Panel es una "instrumentalidad del Estado Libre Asociado de Puerto Rico" que posee *amplia autoridad y discreción* para nombrar y supervisar Fiscales Especiales Independientes, en los casos específicamente determinados por ley. Debemos distinguir, sin embargo,

---

[27] "In determining whether some entity is an agency ... the most important word in the definition may be 'authority' ". *Davis and Pierce, Administrative Law Treatise,* Sec. 1.2 (1994).

que el Panel no es quien investiga los imputados actos criminales, ni tampoco es quien decide presentar cargos criminales; ello le corresponde única y exclusivamente a un FEI. La encomienda legal del Panel es determinar la procedencia del nombramiento de un FEI, y desde luego, supervisarlo. Es importante señalar, además, que la Ley Núm. 2 dispone que la determinación final que haga el Panel de nombrar o no a un FEI es final y firme, por lo cual "no podrá radicarse querella nuevamente por los mismos hechos". 3 L.P.R.A. sec. 99k(5).

Por lo tanto, es forzoso concluir que el Panel cumple con la amplia definición de "agencia" provista por la LPAU.

## B. *Foro con jurisdicción*

Como indicamos previamente, debemos resolver cuál es el foro que tiene jurisdicción primaria en casos como el de autos. Es decir, debemos aclarar en el caso de autos cuál era el foro que, en origen, debió asumir jurisdicción primaria para atender la solicitud de los recurridos: el foro administrativo (*i.e.*, el Panel) o el tribunal de instancia, según sugiere el TCA. Para contestar la interrogante debemos exponer y distinguir los límites de la doctrina de jurisdicción primaria y la de agotamiento de remedios administrativos.

"La doctrina de jurisdicción primaria y la de agotamiento de remedios administrativos guardan relación íntima. Necesitan, no obstante, ser diferenciadas." Fernández Quiñones, *op. cit.*, Sec. 8.7, pág. 464. Si bien hemos indicado que ambas son germanas y persiguen el mismo fin,[28] no deben confundirse. *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 513 (1964).[29]

---

[28] Esto es, el fin de poner orden en la administración de la justicia y armonizar el funcionamiento de la Rama Judicial con el de la Rama Ejecutiva.

[29] Véanse, además: *Brunet Justiniano v. Gobernador*, 130 D.P.R. 248 (1992); *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991); *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347 (1988); *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988); *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987).

## 1. *Doctrina de agotamiento de remedios administrativos*

■ La doctrina de agotamiento de remedios administrativos requiere que una persona que desee obtener un remedio *y acude primero a la agencia* que posea jurisdicción sobre la cuestión, tendrá la obligación, como regla general, de utilizar todos los recursos, procedimientos, y las vías que administrativamente estén disponibles, antes de recurrir a la Rama Judicial. Como ya hemos indicado anteriormente:

> A diferencia de la jurisdicción primaria, la doctrina de agotamiento de remedios administrativos opera *en una etapa posterior del procedimiento ante la agencia.* El principio de agotamiento requiere que el que desee obtener un remedio en una agencia utilice todas las vías administrativas disponibles *antes de recurrir al tribunal.* Bajo esta doctrina la revisión judicial de la decisión administrativa *no está disponible hasta que la parte afectada utilice todos los procedimientos correctivos ofrecidos por el proceso administrativo.* El propósito de esta norma es establecer el momento idóneo en el cual el proceso judicial debe intervenir en una controversia *sometida previamente a la esfera administrativa.* (Émfasis suplido y citas omitidas.) *Colón v. Méndez, Depto. Recursos Naturales,* 130 D.P.R. 433, 442–443 (1992).

Una vez la persona interesada haya agotado todos los remedios provistos por la agencia, *entonces* el acceso al Tribunal de Circuito de Apelaciones estará disponible para una parte adversamente afectada que desee solicitar la revisión judicial de la orden o resolución final emitida por dicha agencia. Véase 3 L.P.R.A. sec. 2172.

■ Si bien las doctrinas de jurisdicción primaria como la de agotamiento de remedios administrativos han sido elaboradas judicialmente, el legislador puertorriqueño específicamente adoptó en nuestro ordenamiento la doctrina de agotamiento de remedios administrativos en la Sec. 4.3 de la LPAU, 3 L.P.R.A. sec. 2173. Según dicha sección, el tribunal podrá relevar a un peticionario de tener que agotar alguno o todos los remedios administrativos

provistos, sólo bajo cinco (5) supuestos: (1) en el caso de que dicho remedio sea inadecuado; (2) cuando requerir el agotamiento resulte en un daño irreparable al promovente y en el balance de intereses no se justifica agotar dichos remedios; (3) cuando se alegue la violación sustancial de derechos sustanciales; (4) cuando sea inútil agotar los remedios administrativos por la dilación excesiva en los procedimientos, o (5) cuando sea un asunto estrictamente de derecho y es innecesaria la pericia administrativa. Íd.[30]

■ En resumen, la norma de agotamiento de remedios administrativos, de ordinario, se aplica en casos en los cuales una parte, *que instó o tiene instada alguna acción ante una agencia u organismo administrativo*, recurre luego ante un tribunal *sin antes haber completado todo el trámite administrativo disponible*. Es decir, la doctrina usualmente se invoca para cuestionar la acción judicial de un litigante *que originalmente acudió a un procedimiento administrativo o era parte de éste, pero habiendo estado allí, no agotó todos los recursos disponibles a su favor.*

## 2. *Doctrina de jurisdicción primaria*

■ Por su parte, la doctrina de jurisdicción primaria ayuda a los tribunales a determinar qué organismo debe hacer una determinación *inicial* del asunto en controversia. Fernández Quiñones, *op. cit.*, pág. 511.[31] Es decir, determina si la acción debe ser presentada ante la agencia concernida o ante el tribunal de primera

---

[30] Para una discusión extensiva sobre la aplicación de estas excepciones estatutarias en la casuística, véase D. Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Colombia, Ed. Forum, 2001, Sec. 8.8.

[31] Como bien señala el profesor Davis:

"The doctrine of primary jurisdiction usually does nothing more than allocate power between courts and agencies to make *initial* determinations. It usually does not allocate power to make *final* determinations, although occasionally it does." 4 *Davis, Administrative Law Treatise* Sec. 22:1, pág. 82 (1983).

instancia.([32]) Ello es así debido a que "[e]l punto de partida es la existencia de una jurisdicción *concurrente* entre el tribunal y la agencia. Empero, [al aplicar la doctrina de jurisdicción primaria] se le cede la primacía al organismo administrativo". (Énfasis suplido y escolio omitido.) Fernández Quiñones, *op. cit.*, Sec. 8.3, pág. 435.([33]) Dicho de otra manera, "[l]a jurisdicción primaria ocurre tan sólo cuando existe jurisdicción concurrente entre el [foro] administrativo y el sistema judicial ...". *Ortiz v. Coop. Ahorro y Crédito*, 120 D.P.R. 253, 262 (1987), y casos allí citados. De hecho, el Tribunal Supremo de Estados Unidos ha expresado que la aplicación de la doctrina no implica que el ejercicio de jurisdicción del Tribunal ha sido eliminado, sino meramente aplazado o "pospuesto". *U.S. v. Philadelphia Nat. Bank*, 374 U.S. 321, 353 (1963). Del mismo modo, hemos expresado que la doctrina simplemente atiende "una cuestión de prioridad de jurisdicción ...". *E.L.A. v. 12,974.78 Metros Cuadrados*, supra, pág. 511.

■ El fundamento principal de la doctrina es que las agencias se consideran mejor equipadas que los tribunales debido a su especialización y al conocimiento obtenido a través de la experiencia. Fernández Quiñones, *op. cit.*, Sec. 8.3, pág. 434; 4 *Davis, Administrative Law Treatise* Sec. 22:1 (1983). Consecuentemente, "[l]a aplicación de la doctrina significa la exclusión de la acción judicial para así obtener los presuntos beneficios que se derivan de la interacción con el ente administrativo especializado". Fernán-

---

([32]) La doctrina de jurisdicción primaria tiene, a su vez, dos (2) vertientes, a saber: la jurisdicción primaria exclusiva y la jurisdicción primara concurrente. Véase *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433, 442 (1992); Fernández Quiñones, *op. cit.*, Sec. 8.4.

([33]) En *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 513 (1964), explicamos el fin que persigue la doctrina de jurisdicción primaria. Dijimos allí que "[s]i los tribunales fuesen a hacer en primera instancia las determinaciones que los estatutos especifican que han de hacerse por los organismos administrativos y por los administradores, se crearía tal confusión que el derecho administrativo sería casi imposible de administrar ejecutiva y judicialmente". Íd., pág. 512.

244

dez Quiñones, *op. cit.*, págs. 434–435.[34] Por tanto, los jueces deben aplicarla, como regla general, en casos en los cuales el peritaje de la agencia sea indispensable para resolver la controversia, ya que los "tribunales [son] de justicia y no centros académicos para dirimir sutilezas técnicas". *Quiñones v. A.C.A.A.*, 102 D.P.R. 746, 751 (1974), voto separado del Juez Asociado Señor Irizarry Yunqué.

Por otro lado, debemos señalar que si bien es cierto que, en teoría, una controversia relativa a esta doctrina puede suscitarse tanto ante un tribunal como ante un organismo administrativo, lo usual es que la doctrina sea alegada, no en el procedimiento administrativo, sino en el curso de un litigio judicial; es decir, *son los tribunales* los que con frecuencia aplican la doctrina para señalar que la responsabilidad *inicial* de adjudicar una controversia debe recaer en el foro administrativo, por éste poseer la pericia necesaria para resolverla. *Davis and Pierce, Administrative Law Treatise* Sec. 14.1, pág. 271 (1994); *Davis*, supra, pág. 82.

Asimismo, debemos señalar que cuando la acción se haya presentado *primeramente (o directamente) ante el tribunal, haciendo caso omiso de la agencia, no habrá duda de que se trata de un asunto de jurisdicción primaria*, y *no* de agotamiento de remedios administrativos. (Énfasis suplido.) Fernández Quiñones, *op. cit.*, Sec. 8.7, pág. 468.[35]

---

[34] No obstante, se ha reconocido que la doctrina de jurisdicción primaria protege también el principio cardinal de uniformidad; es decir, persigue "una mayor racionalidad en el diseño de la norma" para así evitar conflictos. Fernández Quiñones, *op. cit.*, Sec. 8.3, pág. 434. Como señalan los profesores Davis y Pierce:

"In many circumstances, referral of a close and difficult issue to an agency for initial resolution (1) increases the chances of high quality decision, (2) decreases the potential for conflicts among legal institutions, and (3) increases the likelihood that unavoidable conflicts will be resolved in a manner that gives proper respect to the respective responsibilities of the many institutions of federal and state government." *Davis and Pierce*, supra, Sec. 14.6, pág. 301.

[35] A diferencia, como veremos *infra*, la doctrina de agotamiento de remedios administrativos (*exhaustion*, en inglés) aplica cuando la parte acude directa y originalmente a la agencia, pero luego decide recurrir al tribunal prematuramente. Como

■ En términos prácticos, la doctrina de jurisdicción primaria exige que los tribunales emprendan la tarea de examinar los alcances de la ley habilitadora de una agencia, y determinar si el asunto cae estrictamente dentro del ámbito judicial;([36]) asimismo les exige que ponderen y determinen si es imprescindible y necesario que se resuelva a favor de que intervenga inicialmente la agencia. Fernández, *op. cit.*, Sec. 8.4, pág. 443. Como bien apunta el profesor Demetrio Fernández: "La cuestión jurisdiccional es recurrente y exige precisión y claridad en sus soluciones. *La responsabilidad primaria recae en los tribunales* por cuanto son los facultados a interpretar los estatutos y descifrar las confusiones creadas por éstos." (Énfasis suplido.) Íd., pág. 444. Y si en el descargo de esa responsabilidad los tribunales resuelven que es de aplicación la doctrina de jurisdicción primaria en un caso específico, entonces:

> The courts are divested of whatever original jurisdiction they would otherwise possess; their function in the cases concerned is limited to judicial review. This result follows by operation of the primary jurisdiction doctrine; no statute is needed to accomplish it .... (Énfasis suprimido.) B. Schwartz,

---

bien apunta el profesor B. Schwartz, *Administrative Law*, 3ra ed., Boston, Ed. Little, Brown and Company, 1991, Sec. 8.26, págs. 524–525:

"The exhaustion doctrine prevents premature judicial interference with administrative proceedings, while *the primary jurisdiction doctrine denies jurisdiction where agency proceedings have not yet begun.* Exhaustion contemplates a situation where some administrative action has begun, but has not yet been completed; primary jurisdiction situations arise where a plaintiff, *in the absence of pending agency proceedings*, invokes the original jurisdiction of a court." (Énfasis suplido y escolios omitidos.)

([36]) En realidad, no existe una fórmula precisa para saber cuándo aplicar o no aplicar alguna excepción de la doctrina; por tanto, los tribunales tienen que hacer *una evaluación pragmática*, sobre las ventajas y desventajas que implicaría reconocerle a una agencia la facultad adjudicativa inicial en cada caso. *Davis and Pierce*, supra, pág. 272; *United States v. Western Pac. R. Co.*, 352 U.S. 59, 64 (1956). Se ha sugerido, por tanto, la importancia de tomar en consideración varios factores:

"In making such determinations, courts [should] consider several factors, including (1) *the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue*, (2) the need for uniform resolution of the issue, and (3) the potential that judicial resolution of the issue will have an adverse impact of the agency's performance of its regulatory responsibilities." (Énfasis suplido.) *Davis and Pierce*, supra, Sec. 14.1, pág. 272.

*Administrative Law*, 3ra ed., Boston, Ed. Little, Brown and Company, 1991, Sec. 8.27, pág. 527.

■ Ahora bien, la doctrina no es una camisa de fuerza, y bajo ciertas circunstancias, hemos reconocido su inaplicabilidad.[37] Así, pues, no aplica cuando "[l]a naturaleza de la causa de acción presentada y el remedio solicitado destacan que no se presentan cuestiones de derecho que exijan el ejercicio de discreción y de peritaje administrativo", es decir, cuando la cuestión que se plantea sea "puramente judicial". Fernández Quiñones, *op. cit.*, Sec. 8.4, págs. 443–444. En tales casos, se entiende que las agencias carecen de los poderes y de los instrumentos para diseñar el remedio solicitado. Íd. Si "surge claramente que no hay jurisdicción, ningún beneficio se obtiene al obligar al litigante a mantenerse en la agencia". *Ortiz v. Coop. Ahorro y Crédito*, supra, págs. 263–264. En fin, "[e]l dictamen de si existe o no jurisdicción dependerá en gran medida del ejercicio de su pericia administrativa".[38] *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 727 (1982).

Un ejemplo de ello fue *Ortiz v. Coop. Ahorro y Crédito,* supra.[39] Allí resolvimos que la doctrina de jurisdicción primaria no era de aplicación cuando se trataba de "una reclamación estrictamente privada para cuya solución la agencia no [tenía] ningún conocimiento especializado". Íd.,

---

[37] Para una discusión más completa sobre las distintas excepciones que a la doctrina de jurisdicción primaria se han reconocido jurisprudencialmente en otras jurisdicciones, véase Schwartz, *op. cit.*, Secs. 8.28–8.30.

[38] *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 727 (1982). En este caso se aplicó, sin embargo, la doctrina de agotamiento de remedios administrativos. Véase, además, Fernández Quiñones, *op. cit.*, Sec. 8.8, págs. 477–478.

[39] En este caso un empleado de una cooperativa presentó una demanda *en el tribunal* contra su patrono por haber sido destituido sin que previamente se le formularan cargos. La cooperativa solicitó la desestimación por entender que la jurisdicción en primera instancia era la Oficina del Inspector de Cooperativas (OIC), cuya decisión era revisable, a su vez, por la Junta de Apelaciones, establecida por la ley General de Sociedades Cooperativas de Puerto Rico. El tribunal de instancia desestimó la demanda y ordenó el traslado a la OIC. Revocamos por entender que los asuntos planteados en el caso involucraban derechos estrictamente contractuales y estatutarios. Indicamos que "[a]l tribunal le corresponde, en primer lugar, resolver el caso". *Ortiz v. Coop. Ahorro y Crédito*, 120 D.P.R. 253, 262, 264 (1987).

pág. 264. Dijimos que, en tales casos, "son los tribunales los llamados a dirimir la controversia". Íd.

En resumen, la regla general es que un tribunal debe aplicar la doctrina de jurisdicción primaria en todo caso en el cual el peritaje de una agencia sea indispensable para resolver la controversia. A modo de excepción, si la cuestión implicada es *estrictamente* de derecho, por lo cual resulta innecesaria la pericia administrativa, el tribunal retendrá la jurisdicción.

## III

De un examen detallado de nuestra jurisprudencia surge que las controversias relativas al derecho de los ciudadanos a solicitar acceso a información pública en manos del Gobierno tienen, por lo menos, dos (2) vertientes o modalidades: (1) en los casos que caen bajo la primera modalidad, el asunto sobre acceso a información pública nunca es la controversia principal, sino que surge como un asunto incidental en el caso; es decir, surge como una cuestión colateral o contingente a una controversia principal, separada y distinta;[40] (2) la segunda modalidad de controversias sobre acceso a información pública ocurre cuando una persona acude ante un foro adjudicativo *exclusivamente* para ejercer su derecho constitucional de acceso privado a información pública.

El caso *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987), es un ejemplo de la primera modalidad. Se trataba de un agente de la Policía de Puerto Rico. Basándose en un "informe confidencial", el Superintendente de la Policía separó al agente del cuerpo policíaco " 'debido a sus hábitos, confiabilidad y actitudes' ". Íd., pág. 224. Por entender que

---

[40] Véanse, por ejemplo: *Angueira v. J.L.B.P.*, 150 D.P.R. 10 (2000); *Angueira Navarro v. J.L.B.P.*, 151 D.P.R. 605 (2000); *Torres Ramos v. Policía de P.R.*, 143 D.P.R. 783 (1997); *Silva Iglecia v. F.E.I.*, 137 D.P.R. 821 (1995); *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987).

su despido fue ilegal, el cadete apeló la decisión ante la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.), solicitando su reinstalación. No obstante, el foro administrativo confirmó la actuación del Superintendente, basándose nuevamente en el "informe confidencial" preparado por la Policía. En vista de la determinación de J.A.S.A.P., *el agente alegó —de manera colateral— tener derecho a inspeccionar el "informe confidencial", y solicitó acceso al mismo con el fin de cuestionarlo e impugnarlo. Sin embargo, el acceso le fue denegado porque supuestamente su "confidencialidad estaba ampliamente justificada".*

Como podrá apreciarse, la *controversia principal* allí era si la suspensión del agente fue efectuada conforme a derecho. Por lo tanto, la J.A.S.A.P. era claramente el foro con jurisdicción primaria, por poseer el *expertise* necesario para dilucidar *ese asunto.* En cambio, el asunto sobre acceso a información pública surgió meramente como un incidente en la etapa apelativa del litigio administrativo.

Asimismo, en *Torres Ramos v. Policía de P.R.,* supra, se trataba de un cadete que solicitó admisión a la Policía de Puerto Rico. Cuando fue rechazado, el aspirante apeló ante J.A.S.A.P. cuestionando dicha determinación, no obstante el foro apelativo confirmó. El cadete entonces solicitó inspeccionar la prueba del expediente en la cual se basó la Policía y J.A.S.A.P., mas le fue negado. Nuevamente, el asunto sobre acceso a información pública surgió incidentalmente, siendo la controversia principal la legalidad de la denegación de admisión al cuerpo policíaco, cuestión que claramente caía bajo la jurisdicción del foro administrativo, es decir, J.A.S.A.P.

La segunda modalidad de controversias sobre acceso a información pública ocurre cuando una persona acude ante un foro adjudicativo con *el único* objetivo de lograr acceso a información pública en manos del Gobierno, es decir, *exclusivamente para ejercer su derecho constitucional de acceso*

*privado a información pública.*(⁴¹) En estos casos, el asunto sobre acceso a información es la cuestión o controversia principal a resolverse por el foro adjudicativo.

Esta distinción es fundamental para hacer la determinación de qué foro tiene jurisdicción primaria en casos de acceso a información pública. Así, por ejemplo, en una controversia sobre acceso a información pública bajo la segunda modalidad, la controversia que resolver por el foro se reduce estrictamente a un asunto de derecho, a saber: si la persona interesada tiene derecho a obtener la información pública solicitada, a la luz de las leyes, la jurisprudencia o algún reglamento. Como indicamos previamente, la doctrina de jurisdicción primaria sólo aplica en los casos en los cuales el peritaje de una agencia sea indispensable para resolver la controversia principal, pero si la cuestión envuelta implicada es *estrictamente* de derecho, el tribunal retendrá la jurisdicción, ya que la pericia administrativa resultaría innecesaria.

Por lo tanto, debido a que las controversias de acceso a información pública *bajo la segunda modalidad* giran *exclusivamente* en torno a una cuestión jurídica, "son los tribunales los llamados a dirimir la controversia". *Ortiz v. Coop. Ahorro y Crédito*, supra, pág. 264. En consecuencia, resolvemos que, como regla general, y a la luz de la doctrina de jurisdicción primaria, los casos bajo esta segunda modalidad deben ser adjudicados por los tribunales de justicia, ya que en ellos la única cuestión que resolver es estrictamente jurídica.(⁴²)

---

(⁴¹) Véanse, por ejemplo: *Guadalupe v. Saldaña, Pres. U.P.R.*, 133 D.P.R. 42 (1993); *Santiago v. Bobb y El Mundo, Inc.*, supra; *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); *Prensa Insular de P.R. v. Cordero, Auditor*, 67 D.P.R. 89 (1947).

(⁴²) Asimismo, hemos reiterado que el recurso procedente para inspeccionar y obtener copia de documentos públicos ante el tribunal en estos casos es el *mandamus*, como regla general. *Dávila v. Superintendente de Elecciones*, supra, pág. 274; *Prensa Insular de P.R. v. Cordero, Auditor*, supra, pág. 104; Hernández Colón, *op. cit.* Sec. 5803, pág. 434. *Cf. Soto v. Srio. de Justicia*, supra.

El caso de autos, claramente cae bajo la segunda modalidad. Ello es así, debido a que el asunto planteado por los recurridos gira *exclusivamente* en torno a su derecho a inspeccionar información pública en manos del Gobierno. Dicho de otro modo, la única controversia que engendra el presente caso es si los recurridos tienen o no derecho a inspeccionar el expediente en manos el Panel, a la luz del Art. 16 de la Ley Núm. 2,([43]) *supra*, y la jurisprudencia de este Tribunal. Por lo tanto, siendo ello una controversia estrictamente de derecho, forzoso es concluir que el foro con jurisdicción (primaria) en este caso es el TPI. *Ortiz v. Coop. Ahorro y Crédito*, supra, pág. 264.([44])

---

Sin embargo, recientemente resolvimos el caso *Guadalupe v. Saldaña, Pres. U.P.R.*, supra, en donde un estudiante, que ocupaba el puesto de representante estudiantil ante la Junta Universitaria de la Universidad de Puerto Rico (U.P.R.), presentó una solicitud de *mandamus* ante el TPI con el fin de lograr acceso a ciertos documentos relativos a la situación fiscal de la U.P.R. Si bien es cierto que resolvimos desestimar la acción de *mandamus* por falta de agotamiento de remedios administrativos, se subrayó, entre otras cosas, que la documentación solicitada por el estudiante *ya era de su conocimiento*, puesto que como miembro de la Junta Universitaria, había tenido amplia oportunidad de examinarla. Apéndice, pág. 45. Véase, además, Fernández Quiñones, *op. cit.*, Sec. 8.7, pág. 473.

([43]) Dicho artículo establece lo siguiente:

"(1) Con anterioridad a la radicación del informe final el Fiscal Especial no podrá divulgar, excepto al Panel, cualquier información obtenida durante el curso de su investigación.

"(2) A fin de preservar la confidencialidad de las investigaciones y los derechos de las personas imputadas, el Panel no podrá divulgar la información que le haya sido sometida y prohibirá el acceso del público a los procesos que ventile. Por vía de excepción, en los casos en que le sea requerido, el Panel podrá divulgar información o datos bajo su control cuando tal divulgación:

"(a) No interfiere indebidamente con alguna acción judicial o investigación pendiente;

"(b) no priva a la persona del derecho a un juicio justo o a una sentencia imparcial;

"(c) no constituye una intromisión irrazonable en la privacidad;

"(d) no revela la identidad de una fuente confidencial de información;

"(e) no expone al público técnicas o procedimientos investigativos que afecten el curso de estas investigaciones, y

"(f) no expone la vida o la seguridad física de funcionarios, personas o testigos." 3 L.P.R.A. sec. 99w.

([44]) Debido a que el foro con jurisdicción (primaria) para resolver la controversia jurídica en el caso de autos es el TPI, no será necesario analizar si el Panel, como foro administrativo, debió celebrar vista formal administrativa y luego emitir una "orden o resolución" formal, tal como sugirió el TCA en su sentencia. Apéndice, págs. 7–10. Como dijimos, el Panel sencillamente carecía —y carece— de jurisdicción. Por tanto, dejamos para otra ocasión resolver dicho asunto.

# IV

Finalmente, debemos examinar si erró el TCA cuando, a pesar de que denegó la expedición del auto de revisión judicial por ser un recurso "improcedente", acto seguido, precedió a exponer unas "directrices" para la solución del caso.[45] El peticionario alega que el TCA incidió al exponer dichas directrices o guías en su resolución, máxime "cuando no existía una controversia real, por éste carecer de jurisdicción para *entender* en los méritos del recurso". (Énfasis suplido.) Petición de *certiorari*, págs. 7–8. El peticionario arguye que las directrices "constituyen una mera opinión consultiva".

Primeramente, apuntamos que los conceptos de "opinión consultiva" y *obiter dictum* han sido utilizados para referirse a un sinnúmero de prácticas judiciales. Empero, resulta necesario diferenciarlos.

 El concepto "opinión consultiva", que es de estirpe constitucional, se define como la ponencia legal emitida por un tribunal *cuando no tiene ante sí un caso o una controversia justiciable*, y cuyo resultado, por tanto, no es obligatorio. H.C. Black, *Black's Law Dictionary*, 7ma ed., Minnesota, Ed. West Publishing Co., 1999, pág. 1119. La doctrina de opinión consultiva es integral al concepto constitucional de "justiciabilidad" que rige en nuestra jurisdicción, el cual establece como requisito la existencia de un caso o controversia real para el ejercicio válido del poder judicial.

La doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa, ya que no es función de

---

[45] Específicamente, el TCA comenzó su exposición expresando que "es prudente que expongamos el estado de las doctrinas jurídicas aplicables, de manera que sirvan de guía a dicho foro en su ulterior consideración del caso, se pueda [sic] determinar cuáles documentos, o partes de éstos, deben mantenerse confidenciales". Apéndice, pág. 12 *et seq.*

los tribunales actuar como asesores o consejeros. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 721 (1980); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–560 (1958). En fin, a los tribunales les está vedado emitir opiniones consultivas sujetas a revisión e interpretación por las otras ramas de gobierno. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 116.

En cambio, el concepto *obiter dictum* aplica cuando un tribunal emite expresiones innecesarias *en un caso o una controversia ante sí*, y acerca de interrogantes jurídicas que, propiamente, no le han sido planteadas. Black, *op. cit.*, pág. 1100. Tratándose de expresiones no directamente relacionadas con la controversia planteada, éstas no sientan precedente jurídico alguno. *Martínez v. Registrador*, 54 D.P.R. 7 (1938); *P.G.R.R. Co. v. Antonetti et al.*, 17 D.P.R. 325 (1911).

Por sus propios términos, la doctrina constitucional de "opinión consultiva" aplica sólo cuando el asunto sobre el cual un tribunal se expresó *no* cumplía con el requisito constitucional de "justiciabilidad", es decir, *no se trataba propiamente de un "caso" o una "controversia"*. Los tribunales deben estar atentos de que los asuntos ante su consideración sean justiciables. De lo contrario, procede desestimar, sin mayor explicación.(⁴⁶)

Por su parte, como podrá apreciarse, el concepto *obiter dictum* presupone, según definido, que el tribunal ponente *tiene ante sí un caso real y una controversia justiciable*; un *obiter dictum* sólo implica que, al resolver, el tribunal incurre en pronunciamientos innecesarios sobre

---

(⁴⁶) Se ha sugerido que para evitar contravenir la doctrina de opiniones consultivas, los tribunales deben asegurarse siempre de (1) que los litigantes del caso sean realmente adversos; y (2) que exista una probabilidad sustancial de que un dictamen que favorezca a *uno* de los litigantes, tendrá un efecto sobre los intereses de *ambas* partes. E. Chemerinsky, *Federal Jurisdiction*, 3ra ed. Boston, Ed. Little, Brown and Co., 1999, Sec. 1.5, pág. 51.

otros asuntos que no están en controversia o que no le han sido propiamente planteados en el caso. A diferencia de una opinión consultiva, el *obiter dictum* emitido por un tribunal simplemente se debe tener por no puesto, ya que no constituye parte necesaria del fallo, sino que muchas veces son meras expresiones judiciales excesivas e innecesarias.

Ahora bien, como parte de sus pronunciamientos el TCA reconoció que el 5 U.S.C.A. sec. 552 *et seq.* (en adelante FOIA) no aplica directamente a Puerto Rico.[47] Sin embargo, dicho foro expresó que "nos es persuasivo que bajo el FOIA ... las controversias sobre acceso a información se dilucidan mediante juicio *de novo* ante los tribunales de primera instancia y no ante las cortes apelativas". Apéndice, pág. 11. Además, el TCA indicó que "dado que el derecho constitucional concernido es el mismo, hemos examinado el procedimiento provisto en dicho estatuto y visto que éste está acorde con nuestra opinión, a los efectos de que se ventile el asunto ante los tribunales como un juicio *de novo*". Íd. Concluyó, por lo tanto, que no era procedente el recurso de revisión judicial presentado por los recurridos, sino que *procedía remitir el caso al TPI "para que éste entienda en la controversia como un juicio de novo ..."*. Íd., págs. 10. A esos fines, como ya hemos señalado previamente, el TCA procedió a exponer un extenso ensayo sobre el procedimiento establecido en el FOIA y, además, procuró iluminar al foro de instancia con un conciso resumen sobre el estado de la doctrina de acceso a información en manos del Gobierno vigente en Puerto Rico en ese momento.[48] Entendemos que las expresiones del TCA fueron innecesarias y excesivas.

Asimismo, no existe duda de que el caso de autos presenta una controversia justiciable. Por tanto, rechazamos el señalamiento de los recurrentes de que la sentencia del TCA constituye una opinión consultiva. Más aún, habiendo

---

[47] Véase *López Vives v. Policía de P.R.*, supra, pág. 228, esc. 7.

[48] Apéndice, págs. 12–17.

resuelto hoy que el TPI es el foro conveniente para resolver la procedencia de la solicitud de los recurridos en sus méritos —que, como ya establecimos, es una cuestión estrictamente de derecho— entendemos que es innecesario darle mayor consideración a las "guías" o "directrices" ofrecidas por el TCA en esta etapa de los procedimientos. Basta con señalar que fueron innecesarias y, como tal, constituyen *obiter dicta*. Por tanto, simplemente se tendrán por no puestas.

## V

En conclusión, resolvemos que en casos como el de autos, en donde el asunto de acceso a información se suscita en el marco exclusivo de una controversia jurídica, *y ajena a alguna otra cuestión que específicamente requiera la pericia del foro administrativo*, según definida por ley, el TPI será el foro que tiene jurisdicción. Es decir, que un ciudadano puede acudir directamente al tribunal y entablar el recurso judicial correspondiente luego de que el Gobierno le haya denegado acceso a la información solicitada,[49] y siempre que, como en el caso de autos, la *única cuestión planteada* sea estrictamente jurídica: esto es, si se justifica o no el acceso a la información solicitada.

Por lo tanto, resolvemos que, en el presente caso, el foro con jurisdicción para resolver la procedencia de la solicitud de los recurridos de inspeccionar el expediente del Panel es el Tribunal de Primera Instancia.[50] En consecuencia, fue

---

[49] "En la medida en que todo ciudadano tiene el derecho a inspeccionar cualquier documento público, el acto de denegar el acceso, por sí mismo, causa al solicitante un daño claro, palpable y real." *Ortiz v. Dir. Adm. de los Tribunales*, 152 D.P.R. 161, 177 (2000). Ello le daría al ciudadano, "cuando menos, legitimación activa para cuestionar la validez del obstáculo que se interpone al ejercicio de sus derechos constitucionales". Íd.

[50] Valga reiterar que los recurridos han expresado enfáticamente que "*no pretenden en forma alguna que el Tribunal revise directamente las actuaciones del FEI, y menos que le ordene al FEI el presentar cargos criminales contra el Juez Campoamor.*" (Énfasis suplido.) Apéndice, págs. 67–68. Véase el escolio 8 de esta opinión. Solamente desean examinar el expediente como parte de su derecho constitucional a la libre expresión.

correcta en parte la resolución del Tribunal de Circuito de Apelaciones de 15 de enero de 1998 por cuanto denegó el auto de revisión judicial de la determinación del Panel.

No corresponde devolver el caso al TPI, como lo hiciera el TCA, por no haber un caso pendiente ante instancia. Los recurridos, de así creerlo conveniente a sus intereses, podrán presentar ante el Tribunal de Primera Instancia una acción judicial en reclamo de su derecho a la información solicitada.

*Se dictará sentencia de conformidad con lo aquí dispuesto.*

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Fuster Berlingeri concurrieron sin opinión escrita. El Juez Presidente Señor Andréu García y el Juez Asociado Señor Rivera Pérez no intervienen.