Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel XII

| | | |
|---|---|---|
| AERONET WIRELESS BROADBAND, LLC<br><br>Recurrente<br><br><br>*v.*<br><br><br>JUNTA DE SUBASTAS DEL DEPARTAMENTO DE LA VIVIENDA (COST CONTROL)<br>Recurrida | TA2025RA00237 | Revisión Judicial procedente de la Junta Revisora de Subastas de la Administración de Servicios Generales<br><br>Caso Núm.<br>JR-25-137<br><br>Solicitud de Propuesta: CCC-IFB-224-2025-005<br><br>Sobre:<br>Trabajos de Implementación de Internet Comunitario y mejoras a las Comunicaciones para los proyectos del Área XI |

Panel integrado por su presidente, el Juez Candelaria Rosa, el Juez Adames Soto, el Juez Campos Pérez y la Jueza Trigo Ferraiuoli

Adames Soto, Juez Ponente

## **SENTENCIA**

En San Juan, Puerto Rico, a 24 de febrero de 2026.

Comparece Aeronet Wireless Broadband, LLC (Aeronet o el recurrente), mediante recurso de revisión judicial, peticionando que revoquemos una *Resolución* de la Junta Revisora de Subastas de la Administración de Servicios Generales, (Junta Revisora de la ASG o recurrida), emitida el 21 de agosto de 2025. Mediante dicho dictamen, la Junta Revisora de la ASG desestimó la *Solicitud de Revisión Administrativa* instada por Aeronet, al concluir que carecía de jurisdicción sobre los procesos de impugnación de subastas llevadas a cabo por compañías privadas.

Tiene razón la referida Junta Revisora, cabe confirmar.

## I. Resumen del tracto procesal pertinente

La Administración de Vivienda Pública (AVP) suscribió un contrato de *Management Agent Services Agreement* (Acuerdo de Servicios de Agente Administrador) con Cost Control Company, (Cost Control o CCC).[1] De forma general, mediante este acuerdo la AVP le concedía a Cost Control la administración de unos residenciales públicos designados en el propio contrato.

En el ejercicio de las obligaciones contraídas por Cost Control, el 4 de marzo de 2025, este publicó un anuncio público de subasta en un periódico de circulación general, solicitando ofertas de licitadores interesados en realizar unos trabajos de implementación de internet. Cost Control se identificó en dicho anuncio como *Agente Administrador* de AVP. Entre los datos incluidos, se dio a conocer que los fondos para realizar la obra provenían exclusivamente de fondos federales.

Luego de que Cost Control recibiera ofertas por varios licitadores, el 16 de junio de 2025, envió a estos una *Notificación de Adjudicación* de la Subasta Formal CCC-IFB-2024-2025-005, anunciando que su Junta de Subastas adjudicó la buena pro a Neptuno Media Inc. Dicha notificación contenía, además, una lista de las ofertas de todos los licitadores, junto a la advertencia de que tenían derecho a presentar una petición de revisión judicial ante el Tribunal de Apelaciones, dentro de veinte días calendario de la notificación.

Inconforme con la adjudicación, el 27 de junio de 2025, Aeronet presentó una *Solicitud de Revisión* ante la Junta Revisora de Subasta de la ASG. Impugnó la adjudicación de la subasta bajo el fundamento de que fue el licitador que presentó la oferta más baja. De igual forma argumentó que la notificación de la adjudicación era defectuosa, al advertir de forma errónea los remedios disponibles para los licitadores perjudicados, y porque no

---

[1] Este contrato ha sido renovado en distintas fechas, siendo la más reciente del 20 de mayo de 2025. Ver Entrada 9 de SUMAC, Anejo 3.

contenía toda la información en cuanto a los factores que condujeron a que se escogiera a un licitador sobre los demás.

Entonces, luego de considerar un asunto inicial no pertinente al recurso ante nuestra consideración, (sobre si los servicios licitados se consideraban o no profesionales), la Junta Revisora de la ASG emitió la *Resolución* recurrida el 21 de agosto de 2025, desestimando el recurso instado por Aeronet. Según lo adelantamos, dicho foro administrativo concluyó que carecía de jurisdicción para atender el caso, pues la ley habilitadora de la ASG, Ley Núm. 73-2019, *infra*, solo aplicaba a procesos de compras realizados por Entidades Gubernamentales y Entidades Exentas, no así a procesos de subastas entre entes privados. Artículo 3 de la Ley Núm. 73-2019, 3 LPRA sec. 9831b. A tenor, concluyó que Cost Control, quien fungía como Agente Administrador de un residencial público, era un ente privado. En definitiva, siendo la subasta impugnada una llevada a cabo por un ente privado, la Junta Revisora no estaba facultada para atender una petición de revisión al amparo de la Ley Núm. 73-2019.

No conforme con dicho resultado, Aeronet presentó ante este foro una *Solicitud de Revisión Administrativa* el 5 de septiembre de 2025, planteando los siguientes señalamientos de error:

> **Primer error:** Erró la Junta Revisora de Subastas de la Administración de Servicios Generales al concluir que carece de jurisdicción para atender la *Solicitud de Revisión* presentada oportunamente debido a que se trata de una impugnación de subasta que proviene de una entidad gubernamental, según lo define la Ley Núm. 73-2019.

> **Segundo error**: Erró la Junta Revisora de Subastas de la Administración de Servicios Generales al determinar que la subasta fue llevada a cabo para la contratación de servicios profesionales cuyo proceso no se encuentra regulado por las disposiciones aplicables de la Ley Núm. 73-2019; cuando la instalación de internet es un servicio técnico que requiere equipo especializado.

> **Tercer error**: Erró La Junta Revisora al no revocar la determinación de adjudicación de la *Subasta* número CCC-IFB-2024-2025-005 a un licitador que presentó una oferta mayor a la que presentó Aeronet Wireless Broadband, LLC. licitador que presentó la oferta más baja, toda vez que el Manual de Condiciones de la Subasta provisto por Cost Control Company,

Inc. establece que la adjudicación del contrato se otorgará al licitador responsable con la oferta responsiva más baja.

**Cuarto error**: Erró la Junta Revisora al no determinar que la notificación de adjudicación de la subasta CCC-IFB-2024-2025-005 incumple con el estándar mínimo de adecuacidad que incluye: los nombres de los licitadores que participaron en la subasta y una síntesis de sus propuestas; los factores o criterios que se tomaron en cuenta para adjudicar la subasta; los defectos, si alguno, que tuvieron las propuestas de los licitadores perdidosos; y la disponibilidad y el plazo para solicitar la reconsideración y la revisión judicial y los términos para ello.

Superados varios trámites procesales, Cost Control compareció ante nosotros mediate una *Oposición a Petición de Certiorari y/o Revisión Judicial* el 4 de noviembre de 2025. Contando con los escritos de las partes, estamos en posición para resolver.

## II. Exposición de Derecho

### a. Hermeneútica legal

La hermenéutica legal es el proceso de interpretar las leyes; es decir, auscultar, averiguar, precisar y determinar cuál ha sido la voluntad legislativa. Este método de interpretación se utiliza, no solamente en la interpretación de estatutos, "sino también, en la de los contratos, testamentos, reglamentos administrativos y cualquier otro tipo de documento". *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 717, 738 (2012).

Los tribunales tienen la facultad de interpretar las leyes cuando no son claras o concluyentes sobre un punto particular, cuando resulta necesario suplir una laguna en el estatuto, o cuando la justicia lo requiera, para mitigar los efectos adversos de la aplicación de una ley. *Brau, Linares v. ELA*, 190 DPR 315, 340 (2014) [citando a *Pueblo v. Ortega Santiago*, 125 DPR 203, 2014 (1990)]. El juzgador, al sumergirse en esta tarea, debe cerciorarse que se descubra y haga cumplir la verdadera intención y deseo del poder legislativo. IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 738 (citando a Elfren Bernier y Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 242).

Nuestro más Alto Foro ha expresado que el Código Civil de Puerto Rico "contiene una serie de disposiciones dirigidas a guiar el análisis e interpretación correcta de las leyes". IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 738. Una de las reglas de hermenéutica legal que surgen de dicho código es: "[c]uando la ley es clara y libre de toda ambigüedad, su texto no debe menospreciarse bajo el pretexto de cumplir su espíritu". Art. 19 del Código Civil de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5341. Ver también *Romero Lugo v. Cruz, CEE et al.*, 205 DPR 972, 992 (2020).

A su vez, según el artículo 22 de nuestro Código Civil, las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales. En particular, sobre lo enunciado en este artículo, nuestro Tribunal Supremo ha expresado que "[c]uando en el estatuto los términos son claros y susceptibles de una interpretación incuestionable, según el significado común de sus palabras y de su construcción gramatical, los tribunales no deben intercalar palabras ni suplir omisiones al interpretarlo." *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 669 (2014).[2]

Nuestro Más Alto Foro también reiteradamente ha expresado que "[l]os tribunales debemos interpretar los estatutos tomando en consideración el propósito social que los inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias cuando sea necesario." *Alonso García v. S.L.G.*, 155 DPR 91, 99-100 (2001). De surgir alguna ambigüedad en el texto del estatuto, el tribunal debe asegurarse que la interpretación cumple con los propósitos legislativos. Mun. de San Sebastián v. QMC Telecom, supra, pág. 669.

Por ello, al interpretar una disposición especifica de una ley, los tribunales deben considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla. La interpretación de esta debe atribuirle

---

[2] En este caso, el Supremo hace referencia al Artículo 15 del Código Civil del 1930, el cual precede el Artículo 22 del Código Civil del 2020.

un sentido que asegura el resultado que originalmente se quiso obtener. *Id.* No obstante, los tribunales no están "autorizado[s] a adicionar limitaciones o restricciones que no aparecen en el texto de la ley, ni a suplir omisiones al interpretarla con el pretexto de buscar la intención legislativa". *Gautier Vega v. CEE*, 205 DPR 724, 755 (2020) [citando a *Rosado Molina v. ELA*, 195 DPR 581, 589–90 (2016)].

### b. Jurisdicción de las agencias administrativas

La jurisdicción es "el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir los casos que se someten ante su consideración". *DACO v. AFSCME*, 185 DPR 1, 12 (2012); *Cruz Parrilla v. Depto. Vivienda*, 184 DPR 393, 403 (2012). Los organismos administrativos, al igual que los tribunales, no tienen discreción para asumir jurisdicción donde no la hay. *DACO v. AFSCME*, supra, pág. 12. En el caso de las agencias administrativas, estas solo pueden ejercer los poderes expresamente delegados por su ley habilitadora y aquellos que sean indispensables para llevar a cabo su encomienda primordial. *Id.*; *López Nieves v. Méndez Torres*, 178 DPR 803, 810 (2010). Por esta razón, un organismo administrativo no puede asumir jurisdicción sobre una actividad, materia o conducta cuando no está claramente autorizada por ley para ello. *CIC Const. V. JSMP-UPR*, 196 DPR 964, 973 (2016).

Una decisión dictada por un foro administrativo sin que éste posea jurisdicción sobre las partes o la materia es jurídicamente inexistente o *ultra vires. Dávila, Rivera v. Antilles Shipping, Inc.*, 147 DPR 483, 498 (1999). La falta de jurisdicción es insubsanable, ya que ni las mismas partes pueden arrogársela. *MCS Advantage v. Fossas Blanco*, 211 DPR 135, 146 (2023). Por tanto, la aplicación de la doctrina exige que los tribunales examinen los alcances de la ley habilitadora de una agencia para determinar si el asunto cae estrictamente dentro de su ámbito. *Ortiz v. Panel F.E.I.*, 155 DPR 219, 245 (2001), (citando a D. Fernández Quiñones, Derecho Administrativo y la

Ley del procedimiento administrativo uniforme, 2da. Ed., Bogotá, Ed. Forum, 2001, pág. 443).

### c. Ley Núm. 73-2019

La Ley de la Administración de Servicios Generales para la Centralización de las Compras del Gobierno de Puerto Rico de 2019, Ley Núm. 73 de 19 de julio de 2019, según enmendada, (Ley Núm. 73-2019), establece como política pública del Gobierno de Puerto Rico la centralización de los procesos de compras gubernamentales bienes, obras y servicios, con el fin de lograr mayores ahorros fiscales y la transparencia en la gestión gubernamental. En armonía, se delegó en la ASG la responsabilidad de implantar la política pública, dirigir el proceso de adquisición de bienes y servicios y la contratación de servicios del Gobierno de Puerto Rico, entre otros. *Id.*

Mediante la Ley Núm. 73-2019 se creó a la Junta de Subastas, adscrita a la Administración de Servicios Generales, órganos de naturaleza cuasi-judicial, con la facultad de evaluar y adjudicar las subastas del Gobierno de Puerto Rico. 3 LPRA sec. 9836. La Junta de Subastas está facultada para emitir invitaciones de subastas y solicitudes de propuestas selladas, evaluar y adjudicar las propuestas y/o subastas, no aceptar licitaciones que contengan precios en exceso del precio de venta al detal sugerido por el manufacturero, entre otros. Por otro lado, también se creó la Junta Revisora de Subastas, adscrita a la ASG, de igual naturaleza cuasi-judicial, facultada para revisar cualquier impugnación de las determinaciones o adjudicaciones hechas, entre otras, por la Junta de Subastas.

El Artículo 3 de la Ley Núm. 73-2019 establece el alcance de la ley, precisando las entidades obligadas a acudir a los procesos de la ASG, y aquellas excluidas. Dice, en parte, la legislación aludida que:

> *Se exceptúa de la aplicación de esta Ley cualquier Contrato de Operación y Mantenimiento* **con un operador privado** *que no constituya un Contrato de Alianza Público Privada,* o cualquier negocio jurídico análogo a los establecidos en la Ley 29-2019 *[sic]*, según enmendada. **Cualquier operador privado a quien**

*el gobierno haya otorgado un Contrato de Operación y Mantenimiento no vendrá obligado a realizar sus compras a través de la Administración.* No obstante, dicho operador privado podrá realizar sus compras de manera voluntaria, a través de la Administración de Servicios Generales. 3 LPRA sec. 9831b. (Énfasis provisto).

Quiérase decir que, un operador privado con un contrato de operación y mantenimiento con una Entidad Gubernamental no tiene la obligación de realizar sus compras con la ASG. De igual manera, según el mismo artículo, la Junta Revisora no tiene la facultad para revisar una subasta celebrada por un operador privado que tenga una relación contractual con una Entidad Gubernamental que ubique dentro de la descripción citada.

A renglón seguido el artículo 4(q) del mismo estatuto define el término "Entidad Gubernamental" como "toda dependencia y departamento de la Rama Ejecutiva y toda corporación pública del Gobierno de Puerto Rico". Artículo 4(q) de la Ley Núm. 73-2019, *supra.* Cabe destacar que la Ley Núm. 73-2019 no define qué es un Contrato de Operación y Mantenimiento.

## III. Aplicación del Derecho a los hechos

De los señalamientos de error, procede que discutamos solo el primero, pues dispone del recurso. El recurrente plantea en este que la Junta Revisora incidió al determinar que carecía de jurisdicción para atender la *Solicitud de Revisión.* En particular, elabora sobre la relación contractual entre la AVP y CCC, para entonces argüir que la adjudicación de la subasta no ocurrió entre entes privados, pues, a fin de cuentas, la segunda es una representante de la primera, agencia pública ésta bajo la jurisdicción de la Junta de Revisión de la ASG. No nos persuade.

a.

Como señaláramos, el Artículo 3 de la Ley Núm. 73-2019 establece una exclusión general de la aplicación de la ley en cuanto a ciertas entidades. Dentro de estas entidades excluidas se encuentran, precisamente, las privadas *que tengan un contrato de operación y mantenimiento con una Entidad Gubernamental.* Por tanto, no existiendo controversia real sobre el

hecho de que AVP es una Entidad Gubernamental, *véase* Artículo de la Ley Núm. 66 del 17 de agosto de 1989, 3 LPRA sec. 1002, solo correspondería evaluar si el contrato entre Cost Control y AVP es uno *de operación y mantenimiento*, lo cual lo excluiría de la aplicación de la Ley Núm. 73-2019,[3] tarea que acometeremos a continuación.

b.

El 30 de octubre de 2020, Cost Control y AVP entraron en un *Management Agent Services Agreement*.[4] Como adelantamos, de forma general, este acuerdo le concedía a Cost Control la administración de unos residenciales públicos designados. Una mirada a las provisiones u obligaciones pactadas en el contrato nos revela que el acuerdo entre las partes no era uno de mera administración, sino que se extendía a *operación y mantenimiento*.

Así, el inciso 2do del acuerdo establece las obligaciones generales contraídas por CCC y AVP, para en su artículo 2.2 precisar que el *Agente de Administración* (CCC) vendrá obligado a cumplir con las obligaciones de la AVP en cuanto a la administración, *operación y mantenimiento* de los residenciales en el área designada.[5] Sobre lo mismo, el subsiguiente artículo 2.4 dicta que el *Agente Administrador operará* los proyectos de modo que provea vivienda decente, sana, segura y en buenas condiciones a familias elegibles.[6] Se añade que dicha operación será realizada de una forma costo efectiva y eficiente.[7] Por su parte, el inciso 2.7 establece que el *Agente*

---

[3] Dice el citado artículo: "Se crea una agencia gubernamental del Estado Libre Asociado de Puerto Rico que se conocerá como la Administración de Vivienda Pública, adscrita al Departamento de la Vivienda ...". Una Entidad Gubernamental, según la Ley Núm. 73-2019, incluye todo departamento de la Rama Ejecutiva.

[4] Este contrato ha sido extendido en diversas ocasiones, siendo el 20 de mayo de 2025 la fecha más reciente. Ver Entrada 9 de SUMAC, Anejo 3.

[5] "2.2 The Management Agent shall comply with the PRPHA's obligation with respect to the administration, *operation, and maintenance* of the AMPs...."

[6] "2.4 The Management Agent shall, at all times, operate the AMPs provide housing for eligible families that is decent, safe, sanitary and in good repair, in such way as promotes the economy, efficiency, and stability of the AMPs, and the economic and social well-being of its Residents. Said development and operation shall be provided in a cost efficient and effective manner, within the scope of the goals and purposes of both the Federal and State government programs for the AMPs and the Residents."

[7] *Id.*

*Administrador* cumplirá con todos los requisitos federales y estatales asociados a la *operación* y administración de vivienda con asistencia federal.

Continuando con el mismo contrato, pero más más adelante, el inciso 10mo versa sobre *el mantenimiento y las reparaciones de los edificios.* En lo particular, el inciso 10.1 se señala que los gastos ordinarios de mantenimiento y reparación serán pagos por el Agente Administrador, según lo disponga el Presupuesto Operacional.[8] Inmediatamente, el inciso 10.2 establece que el Agente Administrador completará las actividades de mantenimiento en la manera más costo efectiva y eficiente.[9] Dice también el 10.3 que el Agente Administrador podrá realizar *obras de mantenimiento, reparación, construcción, restauración, remodelación, renovación* y otras mejoras de los proyectos que se excedan de lo que constituye el mantenimiento ordinario, siempre y cuando medie autorización previa de la AVP.[10]

Finalmente, los incisos 12 y 14 establecen: que será responsabilidad del Agente Administrador todo lo relativo a las inspecciones de las unidades y de los sistemas y; que el Agente Administrador estará a cargo de las utilidades del proyecto, respectivamente.

Es decir, las obligaciones contractuales asumidas por CCC con AVP ubican dentro de la concepción de *operación y mantenimiento* que prevé el Artículo 3 de la Ley Núm. 73-2019.

c.

Al concluir así lo hacemos sabiendo que la Ley Núm. 73-2019 no contiene propiamente una definición de qué constituye un *contrato de operación y mantenimiento.* No obstante, nuestra labor adjudicativa requiere

---

[8] "10.1 [...] Ordinary maintenance and repair expenses will be paid by the Management Agent as provided in the Operating Budget."
[9] "10.2 The Management Agent shall complete maintenance activities in the most cost-effective and efficient manner...."
[10] "10.3 The Management Agent may perform maintenance, repair, construction, restoration, remodeling, renovation and other capital improvements at the AMPs s that are beyond the ordinary maintenance and repairs of the AMPs, including accessibility modifications ("Extraordinary Maintenance"), with its own employees or qualified independent contractors, when previously authorized by PRPHA."

darles a las palabras de un estatuto su significado común, en tanto resulte compatible con el fin que motivó el estatuto. Al hacer este ejercicio, no resulta difícil interpretar en este contexto que un *contrato de operación y mantenimiento* necesariamente descansa en el significado de sus dos componentes esencial: *operación y mantenimiento*. La palabra *operación*, según el Diccionario de la lengua española de la Real Academia Española, significa "acción y efecto de operar; ejecución de algo...".[11] *Operar*, a su vez, significa "[r]ealizar o llevar a cabo (algo)" o "[t]rabajar, o ejecutar (alguien o algo) una actividad". Por otro lado, la palabra mantenimiento significa, entre otras cosas, "1. Acción y efecto de mantener o mantenerse. 2. Conjunto de operaciones y cuidados necesarios para que instalaciones, edificios, industrias, etc. puedan seguir funcionado adecuadamente. ...".

Por tanto, un contrato de *operación y mantenimiento* es aquel en el que una parte ofrece como prestación el servicio de operar y mantener un proyecto o una actividad. Es decir, en el contrato de operación y mantenimiento las partes pueden pactar un sinnúmero de proyectos para cumplir tal fin.[12]

Por otro lado, el Artículo 3 de la Ley Núm. 73-2019 tampoco detalla qué tipo de contratos de *operación y mantenimiento* ubican dentro de la exclusión general que se establece para operadores privados, con relación al proceso de compras ante la ASG. Sin embargo, el estatuto claramente pauta que operará la referida exclusión sobre cualquier operador privado a quien el Gobierno le hubiese otorgado un *Contrato de Operación y Mantenimiento".*[13] Artículo 3 de la Ley Núm. 73-2019. De lo que se sigue que no hay impedimento en el estatuto, ni en las definiciones de los conceptos, en que el contrato de operación y mantenimiento recaiga sobre unos

---

[11] Esta y las subsiguientes definiciones fueron obtenidas por el *Diccionario de la Lengua Española*, actualización 2025, https://dle.rae.es/contenido/actualizaci%C3%B3n-2025.
[12] Ejemplos son: sobre el mantenimiento de plantas de aguas, de carreteras y autopistas, de incinerador, etc.
[13] La palabra *cualquier* significa, entre otras cosas, "con valor de indeterminación o indistinción antepuesto a sustantivos contables". También, la palabra cualquier "[e]xpresa la totalidad del conjunto denotado por el nombre al que modifica".

proyectos de vivienda pública. La determinación de que un ente privado opere y mantenga unos residenciales públicos es coherente con el significado común de las palabras y con el espíritu de la ley.

Esta conclusión igualmente se ajusta a la política pública de la Ley Núm. 73-2019, que, en su Artículo 2 establece como uno de sus propósitos; *simplificar, aligerar y hacer más eficientes* y transparentes los procesos de compras del Gobierno de Puerto Rico. Se trata de la voz legislativa con pretensión de "optimizar la efectividad y eficiencia de la gestión gubernamental". *Id.*

Por ello, a la luz de los acuerdos alcanzados con AVP, no reputamos a Cost Control Corps como una Entidad Gubernamental sujeta al proceso de subasta bajo la supervisión de la ASG, sino como un sujeto especial exento de los previstos en la Ley Núm. 73-2019. Al no ser aplicable la Ley Núm. 73-2019, la Junta Revisora no tiene jurisdicción sobre el proceso de subasta que Cost Control lleve a cabo.

Debido a que la falta de jurisdicción de la Junta Revisora dispone del recurso, no procede que discutamos los restantes señalamientos de error, al ser innecesario para la resolución del caso. *Véase Ortiz v. Panel sobre el FEI,* 155 DPR 219, 252 (2001).

**IV. Parte dispositiva**

Por los fundamentos que anteceden, se confirma la *Resolución* recurrida.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones